IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 27, 2011

No. 09-40373

Lyle W. Cayce
Clerk

DOUG MORGAN, et al.,

Plaintiffs-Appellees

v.

LYNN SWANSON, et al.,

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

This is a qualified immunity appeal that asks us to decide whether defendant school principals violated clearly established law when they restricted elementary students from distributing written religious materials while at school. Answering this question requires recourse to a complicated body of law that seeks, often clumsily, to balance a number of competing First Amendment imperatives. This body of law failed to place the constitutionality of the defendants' conduct beyond debate, so they are entitled to qualified immunity. Parts I through IV of this opinion, together with the separate concurrences of

No. 09-40373

Chief Judge Jones, Judge King, Judge Garza, Judge Owen and Judge Dennis, reflect the views of the majority of the en banc Court granting qualified immunity to the principals and the judgment reversing the district court.[1]

Although the law was not clearly established, a separate majority of the Court holds that the principals' actions—as alleged in the complaint—were unconstitutional. Parts III A, C, and D of Judge Elrod's opinion represent the opinion of the court on these issues, with special concurrences by both Judge Prado and Judge Owen.

I

The plaintiffs in this case are four former elementary-school students in the Plano Independent School District (PISD), along with their parents. The plaintiffs are evangelical Christians, which is to say, in their own words, that their faith "strongly emphasizes the personal nature of personal evangelism and dissemination of religious viewpoint material." They explain that their religious training and beliefs require them to "communicate religious viewpoint ideas to their peers, classmates, and other students," so as to "introduce . . . classmates . . . to the truth of the Christian Faith." These students and their families have sued PISD because school officials have, at various times and in various ways, prevented them from evangelizing while at school. More specifically, the linchpin of the plaintiffs' claims is that they have been prohibited from distributing written religious materials while at school.

---

[1] Parts I through IV of this opinion, granting immunity to the defendants because the law was not clearly established, are joined by Judges King, Davis, and Stewart. Judge Dennis also joins these Parts in full, except for one point of law in Part IV(A), as discussed in his special concurrence. Judge Owen joins only Parts II through IV.

Part V of this opinion addresses the constitutionality of the principals' conduct, as alleged in the complaint. Parts V(A) through (C) conclude that one of the incidents involving Principal Bomchill was unconstitutional, while Part V(D) concludes that the Court should not reach the underlying constitutional question as to the remaining incidents. Judges King, Davis, Garza, Stewart, and Dennis would not address the constitutionality of the conduct of either principal and join only in Part V(D).

2

No. 09-40373

Before us today are two individual defendants' motions to dismiss for qualified immunity.[2]    Jonathan Morgan and Stephanie Versher (with their parents) bring damages claims against, respectively, Lynn Swanson, principal of Thomas Elementary School, and Jackie Bomchill, former principal of Rasor Elementary School.[3]    The district court denied Swanson and Bomchill's joint motion to dismiss for qualified immunity.  The principals appealed, and a panel of this Court affirmed.[4]  The principals petitioned for rehearing en banc, and we granted their motion.[5]

## A

Plaintiff Jonathan Morgan alleges that Principal Swanson violated his First Amendment rights in connection with a so-called "winter-break" party at Thomas Elementary in December of 2003.  The winter-break parties were conducted yearly at Thomas Elementary in individual classrooms for attendance by all students.  The parties were conducted pursuant to written "guidelines and

---

[2] The case now before us represents a relatively small part of the plaintiffs' larger suit. The complaint mounts facial and as-applied challenges to several versions of PISD's student-speech policy, along with claims against six school officials in their official and individual capacities. These various claims are proceeding in pieces. We have already considered and rejected a facial challenge to one version of PISD's student-speech policy. *See Morgan v. Plano Indep. Sch. Dist.* (*Morgan I*), 589 F.3d 740 (5th Cir. 2009). The as-applied challenge to the school policy and the official-capacity claims will proceed on their own timetable. In other words, this is not our first word on the issues in this case, and it will likely not be our last.

[3] A third student, Michaela Wade, also asserts claims against Swanson. However, the complaint plainly indicates that "[t]he Wade Plaintiffs do not seek damages"; their allegations are offered only in support of the plaintiffs' claims for equitable relief. This is an appeal from a denial of qualified-immunity, which is an immunity from claims for damages only. *See, e.g.*, *Williams v. Ballard*, 466 F.3d 330, 334 (5th Cir. 2006) (citing *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995)). Like the district court below, we do not consider the Wade incident in determining Swanson's entitlement to immunity.

[4] *Morgan v. Swanson*, 627 F.3d 170, *vacated and reh'g granted*, 628 F.3d 705 (5th Cir. 2010) (en banc).

[5] *Morgan*, 628 F.3d at 705.

3

No. 09-40373

regulations"[6] and were planned and supervised by volunteer room parents and individual classroom teachers. Although the parties were conducted in individual classrooms, they were governed across each grade level by strict, specific guidelines.

Third-grader Jonathan Morgan wished to distribute a gift to his classmates at the 2003 winter-break party, as he alleges was common practice at his school. Students typically brought gifts for their classmates to the winter-break parties in gift bags, or "goody bags." Morgan's proposed gift was a "candy cane ink pen," attached to a laminated bookmark containing a written message, "The Legend of the Candy Cane":

> A candy maker wanted to invent a candy that was a witness to Christ.
>
> First of all, he used a hard candy because Christ is the Rock of Ages. This hard candy was shaped so that it would resemble a "J" for Jesus, or, turned upside down, a shepherd's staff. He made it white to represent the purity of Jesus.
>
> Finally, a red stripe was added to represent the blood Christ shed for the sins of the world, and three thinner red stripes he received on our behalf when the Roman soldiers whipped him. Sometimes a green stripe is added as a reminder that Jesus is a gift from God.
>
> The flavor of the cane is peppermint, which is similar to hyssop. Hyssop is in the mint family and was used in the Old Testament for purification and sacrifice. Jesus is the pure lamb of God, come to be a sacrifice for the sins of the world.
>
> So, every time you see a candy cane, remember the message of the candy maker: Jesus is the Christ!

---

[6] The plaintiffs attached to their complaint the guidelines for the winter-break parties, so we may consider them at this stage. We have previously held that, in considering a Rule 12(b)(6) motion, we look at both "the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

No. 09-40373

Morgan intended to distribute these "Legend of the Candy Cane" pens inside his gift bags, which would be inscribed, "TO: [Classmate's name], FROM: Jonathan Morgan."[7]

Morgan's parents suspected, based on conversations with other parents, that school officials would not allow Jonathan to distribute the "Legend of the Candy Cane" in the classroom. Thus, they arranged a meeting with Principal Swanson on December 4, 2003.[8] Principal Swanson confirmed at the meeting that Jonathan would not be allowed to distribute "The Legend of the Candy Cane" at the winter-break party. She offered that he could distribute a goody bag at the party containing nonreligious items, and that he would be permitted to distribute "The Legend of the Candy Cane" at a table in the school library. This offer failed to mollify the Morgans, who never attempted to avail themselves of the "library information table" option. Instead, they consulted their attorney, who sent a demand to Swanson on December 17, 2003, informing her that it was unconstitutional to exclude religious gifts from the classroom parties. Counsel further opined that any Establishment Clause concerns arising from the distribution of religious materials in elementary schools were unfounded. The Morgans demanded that Jonathan "and other students" be

---

[7] Jonathan Morgan is not the first student to file a federal lawsuit over an attempt to distribute some version of "The Legend of the Candy Cane." *See, e.g.*, *Curry ex rel. Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008); *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271 (3d Cir. 2003); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D. Mass. 2003).

[8] At the meeting, they aired a laundry-list of complaints about PISD's treatment of student religious speech. They were unhappy, for instance, that a teacher had instructed their son to write "Happy Holidays" (rather than "Merry Christmas") on a seasonal card for a local senior citizen, prepared as part of a school activity. The Morgans were also offended by Thomas Elementary's characterization of the end-of-semester parties as "winter-break" parties because it is their belief that "Christians do not celebrate 'winter break' parties." However, the Morgans do not seek damages arising from these incidents, which the complaint does not attribute to Swanson.

allowed to distribute religious gifts at the classroom parties, lest they seek redress in federal court.

The next day, December 18, 2003, counsel for the school district responded.[9] The district denied the Morgans' allegations that only religious gifts would be forbidden at the winter-break parties, citing PISD's policy FNAA (LOCAL), which prohibited distribution of "any written material, tapes, or other media over which the school does not exercise control and that is intended for distribution to students" without prior approval from the school. The day before, Carole Griesdorf, another PISD administrator, had given a similar explanation in an e-mail to the Morgans, noting that "[s]tudents may not hand out anything to their classmates in class in bags or separately." The district also reiterated Swanson's offer for Jonathan to distribute his materials in the school library.

Although the district's official position was that no outside materials were to be circulated in the classrooms, it maintained that it would be within its rights to specifically  restrict distribution of *religious* messages in the classroom.[10] Counsel pointed the Morgans to the Third Circuit's decision in *Walz*

---

[9] This letter was attached to the plaintiff's original complaint.  The plaintiffs subsequently amended their complaint, failing then to attach the letter.  This appears to have been an act of inadvertence.  Like the original complaint, second amended complaint—the live complaint in this action— incorporates and discusses the letter, referring to it as "Exhibit 7." However, Exhibit 7 is missing from the live complaint, which skips from Exhibit 6 to Exhibit 8.  We can only assume that this was a good-faith accidental omission on the part of the plaintiffs, who have extensively characterized the letter in their complaint.  Even if it were not, it would be proper for us to consider the letter because the complaint incorporates it by reference. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (noting that "a court ruling on a 12(b)(6) motion may rely on the complaint," along with "'documents incorporated into the complaint by reference'" (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

[10] Specifically, the district's letter said:
The holiday party at issue is a classroom activity that has a clearly defined curricular purpose to teach social skills and respect for others in a festive setting.  This activity is highly structured, supervised, and regulated.  Thus, it is well within the school's ambit of authority to prevent the distribution of candy canes or other media by Jonathan at the holiday party.  Moreover, the

No. 09-40373

*v. Egg Harbor Township Board of Education,*[11] in which that court upheld a school's restriction on a student seeking to distribute a written message—almost verbatim with "The Legend of the Candy Cane"—at a classroom winter holiday party.

Despite having been told that Jonathan would not be allowed to distribute "The Legend of the Candy Cane" at the party, the Morgans nevertheless brought the items to the classroom the day of the party. They confronted Principal Swanson, who again offered that the Morgans could leave the gifts in the library for his classmates to pick up. The Morgans complained that they had observed other students bringing their goody bags into the classroom. In response, Principal Swanson returned to her office and broadcast an announcement to the entire school: students were not permitted to bring outside materials into the classroom for distribution.

The Morgans were unsatisfied with Swanson's "no materials" loudspeaker announcement because Swanson failed to return to Jonathan's classroom and personally require the other students to remove their goody bags. After the announcement, they confronted Swanson again, this time complaining that Jonathan's teacher, Mrs. Helmke, had given a different explanation for why he would not be allowed to distribute "The Legend of the Candy Cane"—its religious viewpoint. The Morgans complain that Swanson failed to "correct" or "apologize for" Mrs. Helmke's actions, or to "state that Mrs. Helmke acted contrary to PISD policy and custom" or take "corrective measures" against her. In the end,

---

school's offer to allow Jonathan to hand out his materials after class or at the designated area for distribution is more than a reasonable accommodation, and eliminates any First Amendment concerns. As you well know, the Third Circuit has recently re-affirmed, under almost identical facts to those present here, that a school's restrictions on an elementary school student's distribution of candy canes and pencils containing a religious message during a classroom holiday party did not violate the First Amendment.

[11] 342 F.3d 271 (3d Cir. 2003).

No. 09-40373

although district officials offered a viewpoint-neutral explanation, the Morgans allege that Jonathan was the only student forbidden from distributing his chosen gift at the 2003 winter-break party.[12]

## B

Plaintiff Stephanie Versher alleges that defendant Jackie Bomchill violated her First Amendment rights by prohibiting her from distributing written religious materials at Rasor Elementary School on three separate occasions. All of these occurred in January of 2004, during Stephanie's second-grade year. In the first incident, Stephanie attempted to distribute to her classmates tickets to a passion play—a "dramatic representation of the scenes connected with the passion and crucifixion of Jesus"[13]—to be performed at a local church. Like the other plaintiffs in this case, it is Stephanie's sincere religious belief that she "should share her beliefs with her friends," apparently including this representation of the "crucifixion of Jesus Christ."

The complaint provides little detail regarding Stephanie's distribution of the passion-play tickets. It is unclear *where* she distributed them: we do not know whether it was in the hallway, the classroom, the restroom, or the playground. Nor is it clear *when* she distributed the tickets, beyond the conclusory label that she distributed them "during non-curriculum times." We do not know whether Stephanie distributed the tickets during passing period

---

[12] We note that the complaint fails to make clear  the exact nature of Swanson's involvement in this speech restriction. The complaint stops short of alleging that Principal Swanson *personally* allowed the other students to distribute their nonreligious gifts, even after her viewpoint-neutral loudspeaker announcement. Thus, it is difficult to discern the Morgans' precise theory of Swanson's liability from the face of the complaint: whether they mean to allege that she personally discriminated against Jonathan's viewpoint, or whether they allege some theory of supervisory liability. We need not resolve this problem with the plaintiffs' pleading, though, because we hold that Swanson would be entitled to immunity even if she had directly and personally restricted *only* the religious gifts.

[13] MERRIAM-WEBSTER'S DICTIONARY, *available at* www.m-w.com.

between classes, in the classroom before the bell rang, or in the moments in between her teacher's lessons.  It is also unclear *how many* tickets Stephanie distributed.  The complaint alleges that she approached other students to "talk to [them] about the drama presentation depicting the crucifixion of Jesus Christ" and "asked them whether or not they would like to attend."  But it fails to allege how many of them accepted the tickets, nor whether she offered them to all interested students.  We also do not know *how* she chose which students  to approach, nor whether she approached them at times when they were free to walk away and not listen to her thoughts on "the crucifixion of Jesus Christ" before declining the tickets.

When defendant Jackie Bomchill, the principal of Stephanie's school, became aware that Stephanie was distributing these tickets, she instructed Stephanie's teacher to stop her from distributing them.  She also asked Stephanie's teacher to collect the tickets from the students that had already received them.

The second incident between Stephanie and Principal Bomchill occurred later that same month, in conjunction with Stephanie's "half-birthday" party. PISD allows students to celebrate their birthdays or "half birthdays" (for students born in the summer) at school with their classmates.  These parties occur during the school day, "primarily at the end of the lunch period or during a snack break between instructional time."  The complaint notes that the school allows students to bring a snack and a small gift to distribute to their classmates. It does not indicate whether these parties typically occur in the classroom, nor whether classmates' attendance is optional or mandatory.

The day of Stephanie's "half-birthday" party, her mother Sherrie Versher brought brownies to share with Stephanie's classmates, with two pencils attached.  One was inscribed with the word "Moon," and the other read, "Jesus loves me this I know for the Bible tells me so."  Sherrie Versher apparently was

concerned that Stephanie would not be allowed to distribute the "Jesus" pencils because of their religious message, so she proceeded to Principal Bomchill's office. At their meeting, Bomchill informed Sherrie Versher that Stephanie could distribute the brownies and the "Moon" pencil, but that she would not be allowed to distribute the "Jesus" pencils. Versher then left Bomchill's office to call her attorney. It is not clear what advice Versher received, but when she returned, she sought only to confirm that the reason the "Jesus" pencils were not allowed was their religious message. Bomchill confirmed this and offered Versher an alternative to distributing the "Jesus" pencils during the school day: Stephanie would be allowed to distribute the pencils after school "outside of the school building."

During the time Versher was in Bomchill's office, Versher was presented with a letter from John Beasley, a campus security official, regarding the earlier incident with the passion-play tickets. Campus security was apparently under the mistaken impression that Sherrie Versher herself (rather than her daughter) had distributed the tickets at Rasor Elementary. The letter informed Sherrie Versher of the school's policy forbidding distribution of materials by an outside person without permission and indicated that "appropriate law enforcement officials may be called when a person refuses to follow the procedures for submitting materials and fails to leave the premises when asked."

After the meeting in Bomchill's office, the situation escalated into hostility. As Sherrie Versher left the school offices, she "thought out loud to herself": "'Satan is in the building.'" It is unclear to whom this "Satan" commentary was directed, but after her "Satan" statement, she alleges that school officials "stalked" her at various locations throughout the school building. Sherrie proceeded to the school cafeteria, where her daughter Stephanie was eating lunch. Sherrie informed her daughter that she would not be allowed to distribute the "Jesus" pencils during school, but that Bomchill had agreed she

could distribute the pencils after school, "outside of the school building." Sherrie gave Stephanie the "Jesus" pencils and instructed her to put them in her backpack until after school, at which time her friends "could meet her on the school lawn to get those pencils."

The third Versher–Bomchill incident occurred later that day, after school. Stephanie Versher again attempted to distribute her "Jesus" pencils, this time "outside of the school building on the school sidewalk and lawn." The complaint carefully alleges that Stephanie was standing "amongst a small group of her classmates," and that she was handing out the "Jesus" pencils only to classmates that approached her and requested one. When Bomchill saw Stephanie distributing the pencils after school, she approached her and told her she could not distribute them "while on PISD school property," and that if Stephanie tried to distribute the crucifixion tickets or "Jesus" pencils again "while on school property at any time, she would be 'kicked out of the school.'" This touched off a disagreement between Bomchill and Sherrie Versher, who was standing by watching her daughter distribute the pencils. "Either Bomchill or Beasley then accused Sherrie Versher of being 'purposely defiant'" of earlier instructions that Stephanie could only distribute her "Jesus" pencils "outside of the building and 'across the street.'" Versher asserts that this accusation was false and represents a retreat from Bomchill's earlier position that Stephanie could distribute the religious pencils so long as she was outside the school.

## II

The action before us is an interlocutory appeal from the district court's denial of a motion to dismiss on qualified immunity. "[A]n order denying qualified immunity, to the extent it turns on an 'issue of law,' is immediately appealable."[14] Our jurisdiction in this context extends to interlocutory appeals

---

[14] *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

No. 09-40373

taken from both denials of motions to dismiss and denials of motions for summary judgment.[15] We review de novo a district court's refusal to dismiss on the basis of qualified immunity.[16] In so doing, we must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmoving party.[17] However, we do not presume true a number of categories of statements, including legal conclusions; mere "labels"; "[t]hreadbare recitals of the elements of a cause of action";"conclusory statements"; and "naked assertions devoid of further factual enhancement."[18]

## III

The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal.[19] This immunity protects "all but the plainly incompetent or those who knowingly violate the law,"[20] so we do not deny immunity unless "existing precedent must have placed the statutory or constitutional question *beyond debate.*"[21] The basic steps of our qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: "(1) that the official

---

[15] *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251 (5th Cir. 2005) (emphasis omitted) (citing *Behrens*, 516 U.S. at 307).

[16] *Id.* at 252 (citing *Wilkerson v. Stalder*, 329 F.3d 431, 434 (5th Cir. 2003)).

[17] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *see also Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) ("The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff." (citing *Sloan v. Sharp*, 157 F.3d 980, 982 (5th Cir. 1998)).

[18] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

[19] *See id.* (noting that qualified immunity's shield applies "so long as an official's actions could reasonably have been thought consistent with the rights they are alleged to have violated").

[20] *Malley v. Briggs*, 475 U.S. 335, 341 (1986)

[21] *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (emphasis added).

No. 09-40373

violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[22]

Courts have discretion to decide which prong of the qualified-immunity analysis to address first.[23]  Here, because our resolution of this appeal turns principally on our conclusion that the rights asserted by the plaintiffs were not clearly established, we address step two of the qualified-immunity inquiry first.

## IV

We hold today that the principals are entitled to qualified immunity because clearly established law did not put the constitutionality of their actions beyond debate. When educators encounter student religious speech in schools, they must balance broad constitutional imperatives from three areas of First Amendment jurisprudence: the Supreme Court's school-speech precedents, the general  prohibition on viewpoint discrimination, and the murky waters of the Establishment Clause. They must maintain the delicate constitutional balance between students' free-speech rights and the Establishment Clause imperative to avoid endorsing religion. "The many cases and the large body of literature on this set of issues" demonstrate a "lack of adequate guidance,"[24] which is why no federal court of appeals has ever denied qualified immunity to an educator in this area. We decline the plaintiffs' request to become the first.

## A

Before discussing the substantive law in this case, we turn to first principles to guide our determination of what it means for the law to be "clearly

---

[22] *Id.* at 2080 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[23] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[24] *Pounds v. Katy Indep. Sch. Dist.*, 730 F. Supp. 2d 636, 638 (S.D. Tex. 2010); *see also Nurre v. Whitehead*, 580 F.3d 1087, 1090 (9th Cir. 2009) ("There exists a delicate balance between protecting a student's right to speak freely and necessary actions taken by school administrators to avoid collision with the Establishment Clause.").

established." When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that "*every* 'reasonable official would understand that what he is doing violates [the law].'"[25]  To answer that question in the affirmative, we must be able to point to controlling authority—or a "robust 'consensus of persuasive authority'"[26]—that defines the contours of the right in question with a high degree of particularity.

Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.[27]  This is true even when the circuit split developed *after* the events in question.[28]  As the Supreme Court explained, "if judges thus disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy."[29]

Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law.  The Supreme Court recently—and forcefully—underscored this point in *Ashcroft v. al-Kidd*, where it noted, with some exasperation, that it has "repeatedly told courts . . . not to

---

[25] *Al-Kidd*, 131 S. Ct. at 2083 (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[26] *Id.* at 2084 (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  In a situation where no "directly controlling authority" prohibits the defendants' conduct, we look to the law of other jurisdictions "in assessing whether a reasonable [official] would have known . . . that his conduct was unlawful."  *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) (discussing *Wilson*, 526 U.S. at 603).

[27] *Wilson*, 526 U.S. at 617–18.

[28] *See id.* (holding that qualified immunity was appropriate because "[b]etween the time of the events of this case and today's decision, a split among the Federal Circuits in fact developed").

[29] *Id.* at 618.

14

define clearly established law at a high level of generality."[30]  This rule is eminently sensible, of course, as the Court has explained:

> [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause . . . violates a clearly established right. . . . But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of [qualified immunity]."[31]

Although the Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that "a case directly on point" is required.[32]  Rather, "existing precedent must have placed the statutory or constitutional question *beyond debate*."[33]  The *sine qua non* of the clearly-established inquiry is "fair warning."[34]  Thus, we must ask "not only whether courts have recognized the *existence* of a particular constitutional right, but also . . . whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct."[35]

---

[30] *Id.* (citations omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (holding that the clearly-established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").

[31] *See Anderson*, 483 U.S. at 639.

[32] *Al-Kidd*, 131 S. Ct. at 2083.

[33] *Id.* (emphasis added).

[34] *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.").

[35] *McClendon v. City of Columbia*, 305 F.3d 314, 331 (5th Cir. 2002) (en banc) (discussing *Wilson*, 526 U.S. at 614–15, and *Anderson*, 483 U.S. at 640).

No. 09-40373

The Supreme Court's admonition in *Al-Kidd* that we should not "define clearly established law at a high level of generality" sits in tension with its earlier statement in *Hope v. Pelzer* that "general statements of the law are not *inherently* incapable of giving fair and clear warning," at least in a certain category of "obvious" cases.[36] In *Hope*, the Court noted that the general Eighth Amendment prohibition against the unnecessary and wanton infliction of pain "*arguably*" gave the defendants "fair warning" that it was unconstitutional to strip a prisoner shirtless and chain him to a hitching post (a painful stress position) for seven hours in the Alabama sun. But the Court's suggestion that generalizations can sometimes clearly establish the law was dicta; the Court did not rest its qualified-immunity decision on such a broad statement. It relied instead on binding circuit precedent prohibiting extremely similar conduct, including "handcuffing inmates to the fence and to cells for long periods of time."[37]

The *Al-Kidd* Court, in admonishing lower courts "not to define clearly established law at a high level of generality," did not discuss or even cite *Hope*, nor other earlier opinions reflecting a similar concern that a damages remedy be available for "obvious" or flagrant constitutional violations.[38] This silence is

---

[36] *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (emphasis added).

[37] *Id.* at 742 (citing *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974)).

[38] *See United States v. Lanier*, 520 U.S. 259, 268–69 (1997) (quoting *Anderson*, 483 U.S. at 640) (rejecting the Sixth Circuit's stringent specificity requirement for "fair warning" purposes in a case involving a state-court judge who sexually assaulted several women in his chambers). The Supreme Court has also favorably cited an oft-quoted Seventh Circuit opinion reiterating the importance of providing for a remedy in the most obvious of cases:

> The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (cited in *Safford Unified Sch.*

16

puzzling given that *Al-Kidd* reversed a Ninth Circuit decision denying immunity in reliance on *Hope*.[39] Adding to the perplexity is that, in its next major "clearly established" opinion after *Hope*, the Supreme Court granted qualified immunity because there were no cases that "squarely govern[ed]."[40] That said, this case does not call on us to decide whether the Court's statements in *Hope* survive *Al-Kidd*: the constitutional issue in this case is far from "beyond debate," as evidenced by a large body of oft-conflicting case law and the variety of opinion among members of this Court. We leave for another day the question of whether and when a constitutional violation may be so "obvious" that its illegality is clear from only a generalized statement of law.

**B**

Because no specific and factually analogous precedent guides our determination of this case, we look first to the Supreme Court's general school-speech precedents. In *Tinker v. Des Moines Independent Community School District*, the Court famously held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[41] This decision has been called the "high water mark" of student speech rights.[42] But

---

*Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2643 (2009)).

[39] *See Al-Kidd v. Ashcroft*, 580 F.3d 949, 970 (9th Cir. 2009), *rev'd*, 131 S. Ct. 2074 (2011) (quoting *Hope*, 536 U.S. at 739).

[40] *Brosseau*, 543 U.S. at 201 (emphasis added). A leading treatise on federal jurisdiction has noted an "obvious tension" between *Hope,* which "declar[ed] that there need not be a case on point to overcome qualified immunity," and *Brosseau*, which found "qualified immunity based on the lack of a case on point." ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 8.6, at 555 (5th ed. 2007).

[41] 393 U.S. 503, 506 (1969).

[42] *E.g.*, Rebecca Aviel, *Compulsory Education and Substantive Due Process: Asserting Student Rights to a Safe and Healthy School Facility*, 10 LEWIS & CLARK L. REV. 201, 229 (2006); Kristi L. Bowman, *Public School Students' Religious Speech and Viewpoint Discrimination*, 110 W. VA. L. REV. 187, 201 (2007) (citation omitted).

No. 09-40373

with every subsequent student-speech decision, the Supreme Court has "expanded the kinds of speech schools can regulate."[43]   Indeed, the rights announced in *Tinker* do not extend to several broad categories of student speech: "lewd, indecent, or offensive" speech;[44] school-sponsored speech;[45] and speech "that a reasonable observer would interpret as advocating illegal drug use."[46] This contraction of student speech rights in public schools has continued even as the Supreme Court has broadened First Amendment rights in other contexts, including in cases involving minors.[47] Indeed, the Court has long recognized that

---

[43] *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 507 (5th Cir. 2009). Indeed, this contraction of *Tinker* led Justice Thomas to lament that the Court has failed to adequately explain "when [*Tinker*] operates and when it does not":

> we continue to distance ourselves from *Tinker*, but we neither overrule it nor offer an explanation of when it operates and when it does not.  I am afraid that our jurisprudence now says that students have a right to speak in schools except when they don't—a standard continuously developed through litigation against local schools and their administrators.

*Morse v. Frederick*, 551 U.S. 393, 418 (2007) (Thomas, J., concurring); *see also* Erwin Chemerinsky, *Teaching that Speech Matters: A Framework for Analyzing Speech Issues in Schools*, U.C. DAVIS L. REV. 825, 831 (2009) ("*Tinker* has never been expressly overruled, but it has been tremendously undermined.").

[44] *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).

[45] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

[46] *Morse v. Frederick*, 551 U.S. 393, 422 (2007) (Alito, J., concurring).  We have identified Justice Alito's concurrence as the controlling opinion in *Morse*.  *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007).

This Court also applies a different standard to student-speech restrictions that are content-neutral.  *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 442–43 (2001) (applying the *O'Brien* standard, which is "virtually the same" as the traditional time, place, and manner analysis).

[47] For instance, outside the school environment, the Court has recently invalidated a California state ban on the sale of violent video games to minors.  *See Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729 (2011).  This is just one example of a recent spate of cases articulating robust First Amendment protections.  *See, e.g.*, *Snyder v. Phelps*, 131 S. Ct. 1207 (2011) (shielding hateful speech at military funerals); *United States v. Stevens*, 130 S. Ct. 1577 (2010) (protecting depictions of animal cruelty); *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010) (holding that the government may not restrict political speech simply because the speaker is a corporation).

No. 09-40373

"the constitutional rights of students in public school are not automatically coextensive with the rights of adults" (or even children) "in other settings."[48] Put differently, when minors speak in public schools, the Supreme Court has held that what is good for the goose is not invariably good for the gander.[49]

We thus evaluate student speech claims "'in light of the special characteristics of the school environment,'"[50] beginning by categorizing the student speech at issue.[51] This is not always an easy task. The speech restrictions in this case are alleged to be viewpoint-specific, but not lewd or drug-related, so we must decide whether to apply the general rule of *Tinker* or the *Hazelwood* rule that applies to curricular or "school-sponsored" speech.[52]

*Tinker* addressed the question of when and "whether the First Amendment requires a school to *tolerate* particular student speech" that "happens to occur on

---

[48] *Fraser*, 478 U.S. at 682 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985)).

[49] *Compare, e.g.*, *Morse*, 551 U.S. at 401 (upholding a school's restriction on a student's "BONG HiTS 4 JESUS" poster at a school event and noting that a student "cannot stand in the midst of his fellow students, during school hours, at a school-sanctioned activity and claim he is not at school"), *with Cohen v. California*, 403 U.S. 15, 16 (1971) (holding that defendant had a First Amendment right to wear a jacket reading "Fuck the Draft" in a municipal courthouse although there were "women and children present").

[50] *Morse*, 551 U.S. at 394 (quoting *Tinker*, 393 U.S. at 506).

[51] *See Morgan I*, 589 F.3d at 745 & n.15 (identifying various categories of student speech).

[52] The plaintiffs also argue that we need not resolve the difficult issue of which precedent to apply because they carefully pleaded that the speech in question was "non-curricular" and thus not within *Hazelwood*'s reach. But whether speech is "school-sponsored" or "curricular" under *Hazelwood* is a question of law for the Court, not a fact entitled to the presumption of truth in a plaintiff's pleading. *See Hazelwood*, 484 U.S. at 268 (treating "school-sponsored" and "curricular" as questions for the court and then answering those questions based on the specific facts before it); *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 189–90 (5th Cir. 1995) (same); *Peck v. Baldwinsville Cent.*, 426 F.3d 617 (same); *Walz*, 342 F.3d at 279 (same); *Bannon*, 387 F.3d 1208 (same); *Fleming*, 298 F.3d at 931 (same); *see also Iqbal*, 129 S. Ct. at 1949 (detailing a number of categories of statements in a plaintiff's complaint that are not entitled to the presumption of truth).

No. 09-40373

the school premises."[53]  School officials may only restrict such private, personal expression to the extent it would "'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,'"[54] or "impinge upon the rights of other students."[55]  *Hazelwood*, by contrast, addressed a different question:  the scope of "educators' authority over school-sponsored publications, theatrical productions, and *other expressive activities* that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."[56]  This is speech that occurs within the context of "school-sponsored" activities, or activities that "may fairly be characterized as part of the school curriculum."[57]  "School-sponsored" activities are by no means limited to the "traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills."[58] Educators enjoy far greater latitude to regulate this latter category of expression and do not offend the First Amendment "so long as their actions are reasonably related to legitimate pedagogical concerns."[59]

This case presents the difficult question of exactly when *Hazelwood*'s more deferential standard applies. Neither the Supreme Court nor this Court has explained whether *Tinker* or *Hazelwood* governs students' dissemination of written religious materials in public elementary schools, whether at official parties, after school on the "lawn and sidewalk," or at unspecified times and in

---

[53] *Hazelwood*, 484 U.S. at 270–71.

[54] *Tinker*, 393 U.S. at 509 (citing *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

[55] *Id.*

[56] *Hazelwood*, 484 U.S. at 271 (emphasis added).

[57] *Id.*

[58] *Id.*

[59] *Id.* at 273.

20

No. 09-40373

unspecified places during the school day. Nor do the facts of *Tinker* and *Hazelwood* offer much guidance. The "private speech" at issue in *Tinker* was the "silent, passive expression of opinion"[60] of students who wordlessly wore black armbands to school to protest the Vietnam War. *Hazelwood* involved student-authored articles produced for the school newspaper as part of a class.

The critical inquiry in deciding whether speech is "school-sponsored" under *Hazelwood* is whether it could reasonably be understood to bear the school's imprimatur, which is synonymous with "sanction," or "approval."[61]  Relevant considerations include (1) where and when the speech occurred;[62] (2) to whom the speech was directed and whether recipients were a "captive audience";[63] (3) whether the speech occurred during an event or activity organized by the school, conducted pursuant to official guidelines, or supervised by school officials;[64] and

---

[60] *Tinker*, 393 U.S. at 508.

[61] MERRIAM-WEBSTER'S DICTIONARY, *available at* www.m-w.com.

[62] *Fleming v. Jefferson Cnty. Sch. Dist.*, 298 F.3d 918, 925 (10th Cir. 2002) ("Expressive activities that do not bear the imprimatur of the school could include a variety of activities conducted by outside groups that take place on school facilities after-school, such as club meetings." (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)).

[63] *Id.* (noting that imprimatur concerns may be heightened where students are a "captive audience" (citing *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 968 (9th Cir. 1999)).

[64] *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 279 (3d Cir. 2003) (holding that school holiday parties were curricular activities because teachers planned the parties and the parties were supervised and regulated by school); *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1214–15 (11th Cir. 2004) (holding that murals made by students were curricular in part because faculty members supervised the project); *Fleming*, 298 F.3d at 930–31 (holding that tiles created by individual students as part of a school beautification project bore the school's imprimatur because the school was "significantly involved in the creation, funding, supervision, and screening process of the tile project"); *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 628–29 (2d Cir. 2005) (concluding that a student's poster was school-sponsored expression because the poster was prepared in response to a school assignment and the school set parameters for posters in advance).

21

No. 09-40373

(4) whether the activities where the speech occurred were designed to impart some knowledge or skills to the students.[65]

The plaintiffs urge a far narrower reading of *Hazelwood*, arguing that it represents the slightest of exceptions to the broad speech rights articulated in *Tinker*. But their view is out of step with a number of our sister circuits, which have treated *Hazelwood* as creating a broad category of speech restrictions entitled to deference from the federal courts.[66] These courts have recognized "how broadly the Supreme Court has defined school curricula for *Hazelwood*'s purposes."[67] Most notable for this case are the Third and Seventh Circuit's applications of *Hazelwood* in the elementary-school context. In a case remarkably similar to this one, the Third Circuit held that *Hazelwood* governed holiday parties held in elementary-school classrooms.[68] And the Seventh Circuit held that the *Hazelwood* standard governed an elementary student's attempt to distribute invitations to a meeting at his church, even "during non-instructional times."[69]

Further complicating our inquiry is the fact that *Tinker*'s application in the elementary-school context has never been clearly established.[70] *Tinker* did

---

[65] *Bannon*, 387 F.3d 1214–15 (applying *Hazelwood* where project was designed to impart knowledge—specifically the creation and appreciation of artwork)).

[66] *E.g.*, *id.* (applying *Hazelwood* to a "school beautification project" for which students did not earn grades or credit, and which occurred on Saturdays and required a separate participation fee); *Fleming*, 298 F.3d at 921, 928 (applying *Hazelwood* to a project at Columbine High School in which students were given the opportunity to create artwork on tiles to be displayed in the school, even though the project was not for students alone and was open to the general community).

[67] *Bannon*, 387 F.3d at 1214–15.

[68] *Walz*, 342 F.3d at 277.

[69] *Muller ex rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539 (7th Cir. 1996).

[70] Even counsel for one of the plaintiffs' amici curiae has recognized as much. *See* Jay Alan Sekulow et al., *Proposed Guidelines for Student Religious Speech and Observance in*

No. 09-40373

not, by its own terms, address the rights of elementary students or involve elementary-aged plaintiffs. Indeed, the petitioners in that case were two high-school students (ages 15 and 16, respectively), and an eighth-grader (age 13).[71] Neither the Supreme Court nor this Court has expressly extended *Tinker*-based speech rights into the elementary-school setting. And at least two of our sister circuits have expressly doubted whether and to what extent *Tinker* applies to protect speech in public elementary schools.[72]

---

*Public Schools*, 46 MERCER L. REV. 1017, 1072 (1995) ("*Tinker* itself dealt with the speech rights of high school and junior high school students. The proposed guidelines [from this article] extend the *Tinker* standard to elementary schools."); *see also* Ann Hassenpflug, *The Limits of Freedom of Speech for Students in Grades PK–8*, 198 EDUC. L. REP. 383, 383 (2005) ("In *Tinker*[,] the Court . . . . did not address . . . any type of elementary student speech."); Jon Perrelle, Note: *An Opportunity for Reform:* Tennessee Secondary School Athletic Association v. Brentwood Academy *and NCAA Recruiting,* 74 BROOK. L. REV. 1213, 1231 n.140 (2009) ("[N]o decisions of the Courts of Appeals apply *Tinker*-based speech rights to the elementary school setting . . . .").

[71] *Tinker*, 393 U.S. at 504.

[72] Both the Third and Seventh Circuits have held that, *if* elementary students enjoy *Tinker*-based speech rights, those rights are far more limited than the rights of older students. The Third Circuit has gone so far as to note that "at a certain point, a school child is so young that it might reasonably be presumed the First Amendment does not protect the kind of speech at issue here." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 418 (3d Cir. 2003).

Similarly, the Seventh Circuit has held that, to the extent elementary students enjoy First Amendment rights at school, those rights are tightly circumscribed in light of their young age. *See, e.g., Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 738 (7th Cir. 1994), *superseded by statute on an unrelated point as recognized in Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 844 (7th Cir. 2004) (noting the "dearth of caselaw in the lower federal courts" discussing "the applicability of the First Amendment to grammar school students," and holding that "age *is* a relevant factor in assessing the *extent* of a student's free speech rights in school"). At least one member of the Seventh Circuit has expressly doubted whether *Tinker* applies to elementary students at all. *Muller*, 98 F.3d at 1538–39 (opinion of Manion, J.) (citation omitted) ("[I]t is unlikely that *Tinker* and its progeny apply to public elementary (or preschool) students."). Several subsequent panels have favorably cited Judge Manion's opinion and expressed similar doubts as to the scope and applicability of the First Amendment in public elementary schools. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) (citing *Muller,* 98 F.3d at 1538–39, for the proposition that "the younger the children, the more latitude the school authorities have in limiting expression"); *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 466 (7th Cir. 2007) (doubting the proposition that the speech clause extends "at least as far down the maturity ladder as a 10-year-old"

No. 09-40373

Central to these courts' speculation that *Tinker* may not apply in public elementary schools is the idea that "age is a relevant factor in assessing the extent of a student's free speech rights in school."[73] The Supreme Court has long held that "a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics."[74] Further, some courts have found the traditional justifications for a robust First Amendment lacking in the elementary-school context. As the Seventh Circuit noted, "[t]he 'marketplace of ideas,' an important theme in the high school student expression cases, is a less appropriate description of an elementary school, where children are just beginning to acquire the means of expression."[75]

## C

Rather than grapple with the complexities of applying *Tinker* and *Hazelwood* in public elementary schools, the plaintiffs urge that the law is clearly established in light of the general First Amendment rule disfavoring viewpoint discrimination. Of course, it cannot be gainsaid that "[d]iscrimination

---

because it stands in tension with *Muller*, 98 F.3d at 1538-39, and *Baxter*, 26 F.3d at 736–38); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 673 (7th Cir. 2008) (relying on *Muller*, 98 F.3d at 1538–39, for the proposition that when a school regulates the speech of children that are "very young . . . the school has a pretty free hand" (citing also *Baxter*, 26 F.3d at 738 (7th Cir. 1994); *Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381, 389 (6th Cir. 2005); *Walker-Serrano*, 325 F.3d 412, 416–17 (3d Cir. 2003); *Lovell by Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373 (9th Cir. 1996)).

[73] *Baxter,* 26 F.3d at 738 (emphasis omitted); *see also Zamecnik*, 636 F.3d at 876 ("[T]he younger the children, the more latitude the school authorities have in limiting expression."); *Nuxoll*, 523 F.3d at 673 (noting that when a school regulates the speech of children that are "very young . . . the school has a pretty free hand" (citations omitted)).

[74] *Hazelwood*, 484 U.S. at 272.

[75] *Muller*, 98 F.3d at 1538; *see also Zamecnik*, 636 F.3d at 876 ) ("[T]he contribution that kids can make to the marketplace of ideas and opinions is modest . . . ." (discussing *Nuxoll*, 523 F.3d at 676–80)).

No. 09-40373

against speech because of its message is presumed to be unconstitutional."[76] But this rule is far too general to clearly establish the law in this case, as the Supreme Court recently reaffirmed in *Al-Kidd*: "We have repeatedly told courts . . . not to define clearly established law at a high level of generality."[77]

At argument, the plaintiffs contended that the "level-of-generality discussion is less important here" because the rule against viewpoint discrimination is absolute. But this is not so. No matter how "axiomatic"[78] the generalized rule against viewpoint discrimination may be, we cannot neglect that this case arises in the public schools, a special First Amendment context,[79] which admits of no categorical prohibition on viewpoint discrimination. The plaintiffs cite a handful of cases that ostensibly establish such a prohibition. But none of these cases involve student speech—let alone elementary-student speech—at school, during the school day.[80]

---

[76] *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–643 (1994)); *see also Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (holding that the Court did not need to determine the nature of a forum for *adult* speech outside of the school day, because of the "well-settled" prohibition on viewpoint discrimination "in any forum").

[77] *Al-Kidd*, 131 S. Ct. at 2084 (citations omitted).

[78] *Rosenberger*, 515 U.S. at 828 (citing *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)).

[79] *Morse*, 551 U.S. at 394 (reiterating that student-speech claims must be considered "'in light of the special characteristics of the school environment" (quoting *Tinker*, 393 U.S. at 506).

[80] *See Good News Club*, 533 U.S. at 113 (invalidating school's restriction on an outside religious group's use of a school's multipurpose facility after school hours); *Rosenberger*, 515 U.S. at 830 (holding that university could not withhold student activities funds from an extracurricular student group simply because of the religious nature of its speech); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (invalidating school district's restriction on a religious group's use of school facilities during times they were not being used for school purposes); *Bd. of Educ. of Westside Cmty. Sch. (Dist. 66) v. Mergens*, 496 U.S. 226, 250–51 (1990) (same); *Widmar v. Vincent*, 454 U.S. 263, 273–75 (1981) (holding that a university that "opened its facilities for use by student groups" could not then discriminate against a particular group because of its religious purpose).

25

No. 09-40373

Not only is there no categorical ban on viewpoint discrimination in public schools, our sister circuits have divided over the question.[81] Indeed, as we have previously recognized, "[a] split exists among the Circuits on the question of whether *Hazelwood* requires viewpoint neutrality" in public schools.[82] Some of the courts to have allowed viewpoint discrimination have done so precisely *because* the speech at issue was religious. For instance, in *Curry ex rel. Curry v. Hensiner*,[83] the Sixth Circuit upheld a school's restriction on a student seeking to distribute a candy-cane message, nearly identical to the one in this case, as part of an organized school activity. The court held that "[t]he school's desire to avoid having its curricular event offend other children or their parents, and to avoid subjecting young children to an unsolicited religious promotional message that might conflict with what they are taught at home qualifies as a valid educational purpose."[84]

---

[81] The plaintiffs have argued that the defendants waived the argument that the law was not clearly established in light of this circuit split. We reject this argument because the plaintiffs briefed cases arising from this *Hazelwood*-based circuit split at every phase of this proceeding: at the district court, before the panel, and now before the en banc Court. Even if they had not, the Supreme Court has held that "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

[82] *Chiras v. Miller*, 432 F.3d 606, 615 (5th Cir. 2005); *see also* 2 RODNEY A. SMOLLA, SMOLLA & NIMMER ON FREEDOM OF SPEECH, § 7:14.50 (Westlaw current through March 2011) ("There is a division among courts as to whether the . . . deferential First Amendment standard articulated in *Hazelwood* is nonetheless trumped and displaced by the First Amendment norm heavily disfavoring viewpoint discrimination."). *Compare, e.g.*, *Fleming*, 298 F.3d at 928 ("*Hazelwood* does not require educators' restrictions on school-sponsored speech to be viewpoint neutral."), *and Ward v. Hickey,* 996 F.2d 448, 454 (1st Cir.1993) ("[T]he Court in [*Hazelwood*] did not require that school regulation of school-sponsored speech to be viewpoint neutral."), *with Searcey v. Harris,* 888 F.2d 1314, 1319 n. 7 (11th Cir.1989) ("[T]here is no indication that the [*Hazelwood*] Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views.").

[83] 513 F.3d 570 (6th Cir. 2008)

[84] *Id.* at 579 (citing *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)).

No. 09-40373

Another of these cases is practically on all fours with the Jonathan Morgan incident before us today. In *Walz v. Egg Harbor Township Board of Education*,[85] the Third Circuit upheld an elementary school's restriction on religious gifts—including pencils inscribed "Jesus ♡ the Little Children" and a version of the same candy-cane message at issue in this case—at seasonal classroom parties. Other students were allowed to distribute their generic seasonal gifts. The Third Circuit reasoned that the student's attempts to distribute the religious pencils were not an attempt at "personal religious observance," but rather an attempt to promote a specific message.[86] The court held that the school's efforts to prevent "advocacy" in classroom activities—religious, political, or commercial—was a legitimate educational purpose, given elementary-school students' impressionability.[87]

## D

Establishment Clause concerns add still another layer of complexity to our legal analysis in this case. Despite widespread judicial recognition of the law in this area as the "the thorniest of constitutional thickets,"[88] the plaintiffs insist that the defendants' Establishment Clause argument is a "red herring" that "borders on frivolous." They argue that school officials' obligations under the Establishment Clause are perfectly clear: to be neutral toward religion at all times. But they neglect that the Supreme Court has explicitly left open "whether a State's interest in avoiding an Establishment Clause violation" can ever justify viewpoint discrimination.[89]

---

[85] 342 F.3d 271 (3d Cir. 2003).

[86] *Id.* at 280.

[87] *Id.* at 277.

[88] *Peck v. Baldwinsville Cent.*, 426 F.3d at 620.

[89] *Good News Club*, 533 U.S. at 113 (citing *Lamb's Chapel*, 508 U.S. at 394–95).

No. 09-40373

Further complicating the law in this area is that other courts have held that the Establishment Clause *requires* educators to prohibit the distribution of religious materials in public elementary schools.[90]  For instance, the Fourth Circuit, in *Peck v. Upshur County Board of Education*, considered a school board's neutral policy allowing for the distribution of Bibles in public schools during the school day.  The board took great pains to avoid the appearance that it was endorsing religion.  As the court described,

> The table displays are set up and stocked entirely by private citizens who are not affiliated in any way with the schools, and the tables bear signs informing students only that they should feel free to take the Bibles or other material offered. Pursuant to district court injunction, the tables also bear a disclaimer, renouncing any sponsorship or endorsement by the school. No one is allowed to enter classrooms to announce the availability of the religious or political material, or to stand at the tables to encourage or pressure students to take the material. No school announcement or assembly is allowed to mark the availability of the Bibles or any other religious or political material. School principals are charged with ensuring strict compliance with these guidelines.[91]

Despite these efforts to avoid endorsement, the Fourth Circuit held the district's policy unconstitutional "to the extent that it allows the display of Bibles and other religious material in the *elementary schools* of the County."[92] The court cited concern that "children of these ages may be unable to fully recognize and appreciate the difference between government and private speech—a difference that lies at the heart of the neutrality principle—the County's policy could more easily be (mis)perceived as endorsement rather than as neutrality."[93]

---

[90] *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 288 n* (4th Cir. 1998).

[91] *Id.* at 275–76.

[92] *Id.* at 288 n.* (emphasis added).

[93] *Id.*

No. 09-40373

Other circuits have recognized the risk that elementary students may misperceive neutrality toward religious speech as endorsement. For instance, in *Walz*, the Third Circuit noted that "in an elementary school classroom, the line between school-endorsed speech and merely allowable speech is blurred."[94] In a high-school classroom, by contrast, "students are mature enough and are likely to understand that a school does not endorse speech that it merely permits on a nondiscriminatory basis."[95]

The plaintiffs insist that these Establishment Clause concerns are unfounded in light of the Supreme Court's decision in *Good News Club v. Milford Central School*.[96] At argument, they asserted that *Peck* "does not survive *Good News Club*" because the Supreme Court in *Good News Club* "rejected the idea that elementary students are different." They are mistaken. Instead, in *Good News Club*, the Supreme Court *reiterated* previous precedents assigning "significance . . . in the Establishment Clause context to the suggestion that elementary school children are more impressionable than adults,"[97] at least when the school can actually be said to be advancing religion. However, the Court held that cases recognizing the impressionability of the youngest children do not go so far as to "foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present."[98] In other words, in *Good News Club*, the Court declined to consider the students' impressionability in light of the facts at hand,

---

[94] *Walz*, 342 F.3d at 277 (citing *Edwards*, 482 U.S. 578).

[95] *Id.*

[96] 533 U.S. 98, 117–18 (2001).

[97] *Good News Club*, 533 U.S. at 115 (citing *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985)).

[98] *Id.*

where "individuals who [we]re not schoolteachers [we]re giving lessons after school to children permitted to attend only with parental consent."[99]  This is a far cry from "rejecting the idea that elementary students are different."[100]

## E

The principals are entitled to immunity because the general state of the law in this area is abstruse, complicated, and subject to great debate among jurists.  At the time of the incidents in question, neither a single "controlling authority" nor a "robust consensus of persuasive authority" had held that the First Amendment prohibits school principals from restricting the distribution of written religious materials in public elementary schools.[101]  Nor had a single federal court of appeals definitively held that *Tinker*-based speech rights inhere in public elementary schools, let alone defined the scope of those rights with a high degree of particularity.  The generalized prohibition against viewpoint discrimination is far too abstract to clearly establish the law in this case, and the circuits are divided over its application in public elementary schools.  The speech rights asserted in this case cannot be said to be "clearly established" when

---

[99] *Id.*

[100] Neither did the Supreme Court "reject the idea that elementary students are different" in *Mergens*.  The plaintiffs and their amici have repeatedly quoted Justice O'Connor's statement, for the plurality, that "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." *Mergens*, 496 U.S. at 250–51 (plurality). However, in quoting this language out of context, they ignore that the plurality opinion in *Mergens* was plainly limited to high-school students.  Indeed, the Supreme Court in *Mergens* held only "that *secondary school students* are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Id.* at 250.

[101] The plaintiffs highlight a Seventh Circuit case invalidating a restriction on a middle-school student's distribution of written religious materials. *See Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1297 (7th Cir. 1993) (invalidating a district policy forbidding distribution of religious material "[a]t the elementary and junior high school"). However, even if this case established a right to distribute such materials in *elementary* schools, this is far from the "robust consensus of persuasive authority" needed to clearly establish the law.

No. 09-40373

balanced against competing Establishment Clause concerns that inhere in public elementary schools.

**(1)**

Factually analogous precedent failed to prohibit Principal Swanson's conduct (restricting the distribution of religious materials at a classroom party), as did the general bodies of law discussed above. Her case is unique among our qualified-immunity cases because, in addition to no law *prohibiting* her conduct, one of our sister circuits had explicitly *sanctioned* almost identical conduct. Swanson had been advised of this precedent—the Third Circuit's decision in *Walz*—before acting, as even the plaintiffs' complaint acknowledges.

*Walz* could hardly be more damaging to the plaintiffs' case against immunity, so they make a number of attempts to distinguish it. First, they argue that the gifts in *Walz* were not distributed between students, but rather through the parent-teacher organization (PTO). This is a plain misreading of the opinion, which indicates that Daniel Walz sought to distribute his gifts directly to his classmates.[102] Second, the plaintiffs argue that *Walz* was not a viewpoint-discrimination case. This argument also fails. It is true that the school policy in *Walz* prohibited students from distributing messages of a "commercial, political, or religious" nature. But the fact that the school in *Walz* discriminated against *several* viewpoints is a distinction without a difference. The plaintiffs' entire viewpoint-discrimination theory is that it is *always* unconstitutional to permit secular or generic seasonal gifts but to prohibit religious ones. It does not save this theory to point out that the policy in Walz permitted secular or generic seasonal gifts but prohibited religious, political, and

---

[102] *See Walz*, 342 F.3d at 273 ("At this particular party, *Daniel brought his gifts directly to class* where he distributed [the religious] pencils *to his classmates*." (emphasis added)); *id.* (noting that at the second party, "*Daniel sought to distribute* candy canes to his classmates." (emphasis added)).

31

No. 09-40373

commercial ones.[103]  Our analysis would be no different if PISD had restricted both religious and political seasonal expressions by restricting Jonathan's "Legend of the Candy Cane" pens and another student's "Stop the war this winter" pencils.

The plaintiffs' third attempt to distinguish *Walz* is that Daniel Walz was allowed to distribute his candy-cane story in an alternative location: "in the school hallway after class or at recess."[104] This fact both fails to distinguish *Walz* and proves far too much.  First, Principal Swanson here repeatedly offered an alternative location at which Jonathan could distribute "The Legend of the Candy Cane."  Second, this attempt to distinguish *Walz* proves too much, because the Third Circuit held that the offering of an alternative forum for religious messages was "*more than reasonable* and perhaps even unnecessary" for First Amendment purposes.[105]

---

[103] We take no position on the substantive correctness of the Third Circuit's holding in *Walz*, that it is a constitutionally legitimate goal to prevent "advocacy" in the elementary-school environment.  We highlight *Walz* instead as a precedent on which Swanson was entitled to rely, for qualified-immunity purposes.

[104] *Id.* at 280.

[105] *Id.* (emphasis added) (citation omitted).

No. 09-40373

## (2)

Defendant Bomchill is also entitled to immunity. We begin our discussion of Principal Bomchill's immunity with the after-school incident. As we discuss in the next Part, we ultimately conclude that Principal Bomchill violated Stephanie Versher's First Amendment rights when she restricted her from distributing "Jesus" pencils outside of school hours to a small group of students who specifically requested them. We are sensitive to the outrage and concern the plaintiffs and various amici feel over this after-school incident, which involved the distribution of a small number of religious items among willing friends, outside of school hours. But our qualified-immunity inquiry does not ask what we think of a defendant's conduct as a normative matter.[106] Rather, qualified immunity is a dispassionate inquiry that asks us only to identify the state of the law as a descriptive matter.

Bomchill is entitled to immunity for this after-school incident because no law gave fair notice that elementary educators may not restrict the distribution of written religious materials to elementary students on the school lawn, after school. As we discuss in the next Part, Stephanie's after-school speech looks far more like the private speech contemplated in *Tinker* than the school-sponsored speech discussed in *Hazelwood*. But we cannot ignore that *Tinker*'s applicability in elementary schools has never been clearly established, and has indeed been questioned by multiple federal courts of appeals.

Neither can we ignore the Fourth Circuit's decision in *Peck*, which forbade the distribution of religious materials in elementary schools on Establishment

---

[106] Further, we think it fitting to withhold some judgment of Bomchill's conduct until a developed record reveals more about the circumstances. Principals like Bomchill often have to make on-the-spot constitutional determinations in the face of litigious parents already determined to sue. Amici educators remind us that parents across the nation have thusly sought to engineer "gotcha" moments for use as fodder for litigation and media campaigns. Only a more developed fact record will reveal if that was the case here.

33

Clause grounds.  *Peck* shares many similarities with Stephanie's after-school incident.  For instance, like the group distributing Bibles in *Peck*, Stephanie distributed her "Jesus" pencils *only* to students who specifically requested them.  And just as the Bible distributors in *Peck* were prohibited from "encourag[ing] or pressur[ing] students to take the material,"[107] Stephanie alleges that she only distributed her pencils to students who specifically sought to receive them.  Despite strong evidence that the speech in question was not the school's, the Fourth Circuit held that allowing distribution of religious items in public elementary schools violates the Establishment Clause in all instances.  Principal Bomchill is entitled to immunity in light of this pronouncement.

Principal Bomchill is entitled to immunity for the two remaining incidents—the half-birthday incident and the passion-play-ticket incident—for largely the same reasons.  The complaint omits important facts necessary to classify the speech in either incident, as we discuss in the next Part.  But even despite important missing details, we are able to conclude that Bomchill is entitled to immunity for these incidents because *Tinker*'s applicability in elementary schools has never been clearly established, and Establishment Clause concerns rendered the law in this area unclear.

---

[107] *Peck*, 155 F.3d at 275–76.

No. 09-40373

## V

At the 12(b)(6) stage, to hold that the defendant violated the law at step one of the qualified-immunity analysis means is simply to say that the plaintiff has stated a claim upon which relief may be granted.[108]  Defendant Bomchill's conduct in conjunction with the after-school incident, as pleaded in the complaint and in the light most favorable to the plaintiffs,  violated Stephanie Versher's First Amendment rights.  The Court should decline for the time being to pass on the constitutionality of the remaining incidents.

## A

Because we have granted immunity to the principals at step two of the qualified-immunity analysis, it is within our discretion to decline entirely to address the constitutionality of the defendants' conduct.  This flexibility was not ever thus.  Indeed, until recently the Supreme Court *required* us in every case to address the underlying constitutional claim, so as to promote "the law's elaboration from case to case."[109]  Then, in *Pearson v. Callahan*, the Court retreated from this "rigid order of battle," granting lower courts discretion over the order of the analysis and making step one optional when immunity is required at step two.[110]  However, the *Pearson* Court cautioned that while "the

---

[108] *See Pearson*, 129 S. Ct. at 815–16 (describing step one of the qualified-immunity procedure as deciding "whether the facts that a plaintiff has alleged [under Rule 12(b)(6)] or shown [under Rule 50 or 56] make out a violation of a constitutional right").  Throughout this appeal, the defendants have vigorously contested the plaintiffs' version of the facts.  The district court will likely confront these same issues again when it addresses the plaintiffs' claims against PISD.  We caution the district court that our ruling today does not preclude a different result on summary judgment or at trial, after the parties have had an opportunity to develop the record through discovery.

[109] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[110] *Pearson v. Callahan*, 129 S. Ct. 808, 817–18 (2009).

35

*Saucier* protocol should not be regarded as mandatory in all cases, . . . it is often beneficial."[111]

The Supreme Court in *Pearson* outlined a number of situations where federal courts might wish to skip step one of the qualified-immunity analysis. These include: (1) "cases in which the constitutional question is so factbound that the decision provides little guidance for future cases"; (2) "when it appears that the question will soon be decided by a higher court"; (3) "[a] constitutional decision resting on an uncertain interpretation of state law"; (4) "[w]hen qualified immunity is asserted at the pleading stage," and "the precise factual basis for the plaintiff's claim or claims [is] hard to identify"; and (5) "circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking."[112]

Recent decisions suggest that the Supreme Court continues in its retreat from the old *Saucier* two-step analysis. In *Camreta v. Greene*, using stronger language than before, the Court clarified that lower courts "*should* address *only* the immunity question" in the circumstances outlined in *Pearson*.[113] The *Camreta* Court further cautioned that lower courts should "think hard, and then think hard again" before unnecessarily deciding the merits of a constitutional issue, and thus risk "turning small cases into large ones."[114] Then, only days later, in *Ashcroft v. Al-Kidd*, the Court cautioned that we should "think carefully before expending 'scarce judicial resources' to resolve difficult and novel

---

[111] *Id.* at 818.

[112] *Id.* at 819–820.

[113] 131 S. Ct. 2020, 2032 (2011) (emphasis added).

[114] *Id.*

questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"[115]

We have "thought carefully" about whether to address the merits of constitutional issues before us today. We conclude that clarifying some of the law's uncertainties would be useful to the district court's conduct of the rest of this case—which includes official-capacity claims against the defendants and an as-applied challenge to the school's speech policy. But we are also mindful that this appeal arises at the pleading phase. Deciding whether some of the incidents in question violated the plaintiffs' rights "depend[s] on a kaleidoscope of facts not yet fully developed,"[116] a situation described in *Pearson* as warranting avoidance of qualified immunity step one. Thus, we exercise our discretion to address the constitutionality of only one of the incidents in question.

### B

As a preliminary matter, because it has been unclear, it should be clarified today that the student-speech rights announced in *Tinker* inhere in the elementary-school context. It is difficult to identify a constitutional justification for cabining the First Amendment protections announced in *Tinker* to older students. This view finds support in other areas of First Amendment law. For instance, the Supreme Court has long recognized elementary students' freedom of conscience in the First Amendment context. Indeed, in *West Virginia Board of Education v. Barnette*, which involved elementary-aged plaintiffs, the Court recognized that the government may not *compel* particular speech from citizens, school children or otherwise.[117] The plaintiffs in *Barnette* were elementary-

---

[115] *Al-Kidd*, 131 S. Ct. at 2080 (quoting *Pearson*, 555 U.S. at 236–37).

[116] *Pearson*, 129 S. Ct. at 819 (citing *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69–70 (1st Cir. 2002).

[117] 319 U.S. 624 (1943). The plaintiffs throughout this case argued that *Barnette* itself established the affirmative speech rights of public-school students, but the Supreme Court

school students.  A recent Supreme Court decision also recognized the First Amendment rights of the youngest Americans—outside of the school environment—in invalidating a California ban on the sale of violent video games to minors.[118]

In affirming that *Tinker*-based speech rights apply to elementary students, we must be mindful of a long-established countervailing principle: in public schools, the "speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students."[119]  Indeed, "common sense" dictates that "a 7–year–old is not a 13–year–old[,] and neither is an adult."[120]  In other words, to extend *Tinker*'s protections to public elementary schools is not necessarily to hold that the speech rights of elementary students are coextensive with those of older students.  As the Third Circuit has recognized, the *Tinker* framework is a flexible, "case-by-case" approach that is capable of accommodating the concern "[t]hat elementary students require a greater degree of control, or a different kind of control."[121]

*Tinker* protects private student expression where there is no "interference, actual or nascent, with the schools' work or collision with the rights of other students to be secure and to be let alone."[122]  Courts' analysis of the "work of the

---

itself has not subsequently construed *Barnette* as such.  *See, e.g.*, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." (citing *Barnette*, 319 U.S. at 642); *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005) ("We first invalidated an outright compulsion of speech in *West Virginia Bd. of Ed. v. Barnette*.").

[118] *Brown*, 131 S. Ct. at 2741.

[119] *Walker-Serrano*, 325 F.3d at 416–17.

[120] *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2407 (2011).

[121] *Walker-Serrano*, 325 F.3d at 417.

[122] 393 U.S. at 508.

schools" and the "rights of other students" can and may often look different in the elementary-school context. The Texas Elementary School Principals Association reminds us that the "work" of public elementary schools is in many ways broader than that of public high schools. High school students obviously already have a grasp on the most basic social and behavioral tasks, like "going to the restroom alone." By contrast, these amici remind us, the youngest elementary students "cannot easily discern fact from fiction, nor can they easily process serious political, religious, and social issues on their own." It follows, then, that some speech might be "materially and substantially disruptive" to the work of a public elementary school, but not to a public high school.

Further, an analysis of whether student speech infringes on the rights of others, including "the right to be let alone," may also look different in the elementary-school context.[123] Elementary students are more susceptible to coercion and peer pressure, while older students are better equipped emotionally and intellectually to filter the potentially hurtful words of their classmates or walk away from speech that bothers or offends them. But there is no reason that the *Tinker* framework cannot accommodate this concern.

It is also true that the exceptions to *Tinker*'s general rule, as announced in *Hazelwood*, *Fraser*, and *Morse,* might also look different in an elementary-school context. For example, *Hazelwood* applies to speech that "students . . .

---

[123] As the Seventh Circuit has recognized,

[i]n a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact. Racist and other hateful views can be expressed in a public forum. But an elementary school under its custodial responsibilities may restrict such speech that could crush child's sense of self-worth.

*Muller*, 98 F.3d at 1539–40.

might reasonably perceive to bear the imprimatur of the school."[124]  This "imprimatur of the school" inquiry may vary based on the age of the students involved, just as it does in the Establishment Clause context.  Indeed, courts have recognized that, "in an elementary school classroom, the line between school-endorsed speech and merely allowable speech is blurred."[125]  Similarly, the threshold for what constitutes suggestive or lewd speech, as discussed in *Fraser*, might be lower in an elementary-school setting.  The case before us today does not call on us to resolve these questions.  They are noted here simply as a potential way of accommodating the well-established concern that the boundaries of appropriate speech may look markedly different in elementary schools than in middle or high schools.

## C

Having determined that *Tinker* applies in elementary schools, we must also conclude that Principal Bomchill violated Stephanie Versher's First Amendment rights in connection with the after-school incident.  On the facts alleged in the complaint, this incident involves private speech governed by *Tinker*, not school-sponsored speech under *Hazelwood*.  A reasonable person would not have believed that Stephanie Vesher's act of handing pencils to a select few recipients after school bore the imprimatur of the school.  Indeed, the complaint alleges that Stephanie distributed her pencils only to a "small group of her classmates," and, even then,  she distributed them only to students who specifically asked her for one.  The speech occurred after school hours, "on the lawn and sidewalk."  There is no indication that students were engaged in any sort of structured activity at the time of the distribution, nor that the students were under the supervision of teachers, either of which might lend an

---

[124] 484 U.S. at 271.

[125] *Walz*, 342 F.3d at 277 (citing *Edwards*, 482 U.S. 578).

appearance of imprimatur.   Nor is there any indication that Stephanie distributed her materials to a captive audience of students who were not free to reject her speech.

Given that *Tinker* governs this after-school incident, Principal Bomchill's actions, as pleaded in the complaint, were unconstitutional.   There is no indication that Stephanie's distribution of a few pencils to her good friends interfered with the "work of the school" or infringed on the rights of other students.  For instance, there is no indication that Stephanie interfered with the conduct of the carpool or bus lines, nor that the "Jesus loves me" message on her pencils caused a spillover disruption into other parts of the school.   The defendants do not argue that Stephanie's pencils were age-inappropriate, nor do they suggest that her distributing them infringed on the rights of other students. To the contrary, Stephanie was careful to allege that she distributed pencils only to students who wanted them.

Important    to    the    conclusion    that    Principal    Bomchill    acted unconstitutionally is the fact that she allegedly restricted Stephanie's "Jesus" pencils *solely* because of their message.  From this pleaded fact, it can only be inferred that Stephanie would have been allowed to distribute her pencils if they had born a secular message.  *Tinker*, when it applies, cannot countenance such a restriction on private student speech.  In other words, a school cannot allow one student to distribute "Jesus" pencils on the school bus but forbid another from distributing "Mohammed" pencils; nor could it allow one student to distribute copies of the Democratic party platform but forbid his classmate from disseminating its Republican analog.  That said, it must be clarified that we do not  hold  that  public  elementary  schools  must  *always*  allow  students  to disseminate written materials, so long as the distribution occurs outside of a "school-sponsored" activity.   For example, this opinion does not reach a hypothetical rule forbidding students from sharing gifts or invitations with only

a select few students, so as to avoid unfairness or hurt feelings. Rather, it holds simply that, where *Tinker* applies in public elementary schools, a school may not allow some speech on a given topic but not others, based solely on the content of its message.

**D**

We decline, for now, to pass on the constitutionality of the remaining incidents. The Supreme Court recently cautioned that, at the pleading stage, where "the precise factual basis for the plaintiff's claim or claims [is] hard to identify," we "should address *only* the immunity question."[126] We think the remaining three incidents in this case—the passion-play-ticket incident, the half-birthday party, and the winter-break party—fall squarely within this admonition.

The two remaining allegations against Principal Bomchill are that she restricted Stephanie Versher from distributing passion-play tickets while at school and restricted her from distributing "Jesus" pencils at her half-birthday party. Whether these actions violated Stephanie's rights "depend[s] on a kaleidoscope of facts not yet fully developed." Specifically, the complaint omits a number of facts that are essential to the determination of whether *Tinker* or *Hazelwood* governs. With respect to the passion-play tickets, we cannot determine whether the speech could reasonably have been understood to bear the school's imprimatur because we do not know when, where, or how widely Stephanie distributed them; nor whether she distributed them during events conducted pursuant to official guidelines; nor whether she distributed them under the supervision of faculty; nor whether she "approached" other students to discuss the crucifixion while they were a captive audience.[127] Likewise, it is

---

[126] *Camreta*, 131 S. Ct. at 2032.

[127] These are the factors courts consider when determining whether to apply *Hazelwood*. *See supra* nn.56–60 and accompanying text. The Vershers attempt to plead away

difficult to determine whether Stephanie's half-birthday party was "school-sponsored" event under *Hazelwood* because we do not know whether the party occurred pursuant to specific guidelines; nor whether it was designed to impart specific knowledge or skills; nor how many students attended; nor whether teachers were present and supervising. Given the complaint's reticence as to the specific details of these events, we decline to "resolve the difficult and novel questions of constitutional . . . interpretation" they present.[128]

The remaining allegation is that Principal Swanson restricted Jonathan Morgan from distributing "The Legend of the Candy Cane" at a 2003 winter-break party. We decline, for the time being, to pass on the issue, which depends on a number of undeveloped facts. As a preliminary matter, we are able to conclude fairly easily that the deferential *Hazelwood* standard governs this incident. As the district's attorneys advised the Morgans, the winter-break parties have a "clearly defined curricular purpose to teach social skills and respect for others in a festive setting," and the parties are "highly structured, supervised, and regulated." Indeed, the parties are conducted in accordance with specific written guidelines that stress uniformity across the grade level. Thus, we have little trouble concluding that the winter-break parties were "school-sponsored" activities and that *Hazelwood* is the proper governing standard.

Having concluded that *Hazelwood* applies, our next task is to consider whether the school's restriction of Jonathan's speech was "reasonably related to legitimate pedagogical concerns." Resolution of this question would benefit greatly from a more developed factual record, and we need not decide it now; this

---

*Hazelwood* by alleging that Stephanie distributed her tickets only "during non-curriculum times," but this conclusory allegation is not entitled to the presumption of truth. *See supra* n.47.

[128] *Al-Kidd*, 131 S. Ct. at 2080 (quoting *Pearson*, 555 U.S. at 236–37).

issue will arise again when the district court addresses the plaintiffs' claims against the school district. Consideration of this question would benefit greatly from the testimony of school officials and argument from the district. If they wish, the plaintiffs at that time may present testimony from their own experts, argue that the school's pedagogical concerns were not "legitimate," or to argue that the restrictions involved were not "reasonably related" to those goals. Given that Swanson is entitled to immunity, we think it best to leave this inquiry, which involves questions of both fact and law, for summary judgment.

## CONCLUSION

The defendants in this case are entitled to qualified immunity because existing precedent failed to place the constitutionality of their conduct "beyond debate." Like other educators to have contended with religious speech in public schools, Swanson and Bomchill had to make on-the-ground decisions balancing constitutional imperatives from three areas of First Amendment jurisprudence: the Supreme Court's school-speech precedents, the general prohibition on viewpoint discrimination, and the murky waters of the Establishment Clause. The law tasked them with maintaining the most delicate of constitutional balances: between students' free-speech rights and the Establishment Clause imperative to avoid endorsing religion. But it failed to provide any real, specific guidance on how to do so. Moreover, almost all of the federal courts of appeals to have to considered speech restrictions in this area have found no constitutional violation in the first instance, including one case with facts nearly identical to those now before us. And no federal court of appeals has *ever* denied qualified immunity to an educator in this area. We decline the plaintiffs' request to become the first.

In short, for the reasons stated in Part IV of this opinion, we REVERSE the judgment of the district court and REMAND with an instruction to dismiss the plaintiffs' claims as to Swanson and Bomchill in their individual capacities.

44

No. 09-40373

EDITH H. JONES, Chief Judge, together with Judges JOLLY and SOUTHWICK specially concurring:

I fully agree with Judge Elrod's passionate defense of the centrality of free speech for school children and the axiomatic prohibition of viewpoint discrimination. But I lament that, as Judge Benavides's opinion shows, many other courts have simply not seen the issues that way in somewhat analogous cases to the one before us.[1] I regretfully vote to reverse the denial of qualified immunity to these principals.

Doing so, however, makes no sense unless the en banc court attempts to state the law correctly and prevent school officials in the future from censoring private speech by students simply because it is religious. I vote to adopt Parts III A, C and D of Judge Elrod's analysis showing that the actions of these principals violated the students' freedom to communicate with their peers in each of the four instances before us. These instances do not fall within *Hazlewood*, as Judge Elrod demonstrates. Our firm statement of the principles supporting the children's free speech in these instances is important to clarify the law of the Fifth Circuit.

---

[1] It must be emphasized that Judge Benavides's opinion thoroughly describes the case law creating uncertainty that supports the principals' immunity, but this is not an endorsement of any of those cases. In particular, I cannot understand the contention that viewpoint discrimination may be uniquely permissible in public schools against student religious speech, nor are expressed Establishment Clause concerns even plausible here. Citing *Hazlewood* to justify the censorship of religious candy canes at winter break parties is plainly hostile not only to the students' religious beliefs but to the Judeo-Christian tradition that is the only reason we ever had winter break parties to begin with. I disagree with other courts that have expanded these theories without any basis.

No. 09-40373

KING, Circuit Judge, with whom DAVIS, Circuit Judge, joins, specially concurring:

I concur in Judge Benavides's opinion granting qualified immunity to Principals Bomchill and Swanson. I do not join Part V A-C of that opinion. Nor have I joined the opinions of Judge Elrod and others deciding that the complaint states a claim for the violation by Principals Bomchill and Swanson of the First Amendment rights of the students involved here. The latter question need not have been decided now, and I think the ultimate resolution of that question would have benefitted from further factual development. The opinions of Judge Elrod and others, together with various briefs, have characterized the speech involved here as private, non-disruptive, student-to-student speech, analogizing it to a spontaneous student expression of a religious belief. I am not entirely comfortable that is all that is involved here. The pleadings suggest to me considerable parent involvement in the events at issue, a possibility that is reinforced by the detailed opinion of Judge Elrod. Some degree of parent involvement in those events may be inevitable by reason of the young age of the children. But it may also be caused in part by the faith of the parents. Evangelizing is an important obligation in some faiths, and parents who are adherents to such a faith might well want not only to evangelize appropriately but also to inculcate that obligation in their children and to teach them how it is done. An elementary school principal, dealing (at least in part) with parents who may reasonably be perceived as using the school venue to proselytize,[1] might well be concerned about the response of other parents. Perhaps that is not an issue here, but if it is, it might have better informed the question decided by the opinions of Judge Elrod and others.

---

[1] Webster defines "proselytize" as "to recruit members for an institution, team, or group [especially] by the offer of special inducements." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1821 (1993).

No. 09-40373

EMILIO M. GARZA, Circuit Judge, specially concurring:

I completely agree with the first paragraph of Chief Judge Jones's special concurrence, which concludes that the principals are entitled to qualified immunity because clearly established law did not put the constitutionality of their actions beyond debate. Accordingly, I join the first part of her opinion.

However, because we are ruling on a motion to dismiss, I am reluctant to proceed further and declare as a matter of law, based only on the pleadings, that these incidents constituted First Amendment violations. As the Supreme Court has articulated, "[w]hen qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify," and deciding whether a violation has occurred "is an uncomfortable exercise where . . . the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." *Pearson v. Callahan*, 555 U.S. 223, 238-39 (2009) (internal citations and quotation marks omitted).

No. 09-40373

DENNIS, Circuit Judge, specially concurring in Parts I to IV and V.D, but not joining Part V.A to C or reaching the issue addressed therein:

I concur in Judge Benavides' opinion, but I do not join Part V.A to C because I respectfully do not agree that we should reach the issue addressed therein, and, accordingly, I concur in the judgment only insofar as it grants defendant-appellants qualified immunity.

I also do not join fully in Part IV.A of Judge Benavides' opinion because I disagree with one of its premises in discussing clearly established law. Specifically, I disagree with the blanket statement that "generalizations and abstract propositions are not capable of establishing the law." Judge Benavides' Op. 14. In *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), the Supreme Court "appear[ed] to require a relatively high degree of specificity before a rule can be called 'clearly established.'" *Schneyder v. Smith*, — F.3d —, 2011 WL 3211504, at *11 (3d Cir. July 29, 2011) (citing *Anderson*, 483 U.S. at 640). However, the Court was also "at pains to emphasize that '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.'" *Id.* at *11 (quoting *Anderson*, 483 U.S. at 640) (citation omitted).

"The Court further expounded this principle in a line of cases beginning with *United States v. Lanier*, 520 U.S. 259 (1997)." *Schneyder* 2011 WL 3211504, at *11. In *Lanier*, the Supreme Court "held that the defendant was entitled to 'fair warning' that his conduct deprived his victim of a constitutional right . . . ." *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). In so doing, the *Lanier* Court "expressly rejected the requirement that previous cases be 'fundamentally similar'" in order to give fair warning. *Hope*, 536 U.S. at 741. The Court explained:

48

No. 09-40373

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

*Lanier*, 520 U.S. at 271 (quoting *Anderson*, 533 U.S. at 640). Although *Lanier* dealt with another statute, 18 U.S.C. § 242,[1] the Supreme Court explained "that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was 'clearly established' in civil litigation under [42 U.S.C.] § 1983." *Hope*, 536 U.S. at 739-40.

In *Hope v. Pelzer*, the Supreme Court "granted certiorari to determine whether the Court of Appeals' qualified immunity holding comport[ed] with [its] decision in [*Lanier*]." *Hope*, 536 U.S. at 733. The court of appeals in *Hope* had "stated that 'the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory,' and established, not by 'abstractions,' but by cases that are 'materially similar' to the facts in the case in front of us." *Id.* at 736 (quoting *Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001)) (internal quotation marks omitted). The Supreme Court applied the same reasoning as in *Lanier* to reject the court of appeals' requirement that cases must be "materially similar" in order to clearly establish a constitutional right:

> Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the

---

[1] " Section 242 makes it a crime for a state official to act 'willfully' and under color of law to deprive a person of rights protected by the Constitution." *Hope*, 526 U.S. at 739.

law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

*Id.* Thus, *Hope* makes plain that the correct standard to apply in a clearly established inquiry is whether the state actor had fair and clear warning that his actions were unconstitutional.

I do not agree with Judge Benavides' opinion's characterization of this language as merely dicta. Judge Benavides reasons that the Supreme Court ultimately relied on prior circuit precedent to conclude that the defendants had violated the plaintiff's clearly established constitutional rights. Judge Benavides' Op. 15. However, the *Hope* Court reversed the court of appeals not only because it reached the wrong result on qualified immunity based on prior circuit precedent, but also because it had wrongly applied the "materially similar" standard in reaching that result. Indeed, the Court first held that the fair warning standard from *Lanier* should be used to evaluate whether the defendants were entitled to qualified immunity, and then applied that standard to conclude that they were. *See Hope*, 536 U.S. at 746 ("The 'fair and clear warning,' [*Lanier*, 520 U.S. at 271,] that these [prior circuit] cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage."). Therefore, the Court's pronouncements on the fair and clear warning standard were an essential part of its holding in *Hope*.

Moreover, in the years since *Hope*, the Supreme Court has reaffirmed this principle. For example, the Court recently stated:

> To be established clearly . . . there is no need that "the very action in question [have] previously been held unlawful." . . . The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest cases don't even arise." But even as to action less than an outrage, "officials can still be on notice that their

conduct violates established law . . . in novel factual
circumstances."

*Safford Unified Sch. Dist. # 1 v. Redding*, 557 U.S. ——, 129 S. Ct. 2633, 2643
(2009) (fourth and fifth alterations in original) (quoting *Wilson v. Layne*, 526
U.S. 603, 615 (1999); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th
Cir. 1990); *Hope*, 536 U.S. at 741); *see also Brosseau v. Haugen*, 543 U.S. 194,
199 (2004) (per curiam) ("*Graham* [*v. Connor*, 490 U.S. 386 (1989),] and
[*Tennessee v. Garner*, 471 U.S. 1 (1985)], following the lead of the Fourth
Amendment's text, are cast at a high level of generality.  Of course, in an
obvious case, these standards can 'clearly establish' the answer, even without
a body of relevant case law." (citations omitted) (citing *Hope*, 536 U.S. at
738)).  The Supreme Court's recent decisions in *Camreta v. Greene*, 131 S.
Ct. 2020 (2011), and *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), do not
overrule *Hope*, *Lanier*, or any case in that line.  In fact, the majority in
neither *al-Kidd* nor *Camreta* mentions them, and Justice Kennedy's
concurrence in *al-Kidd* cites *Lanier* affirmatively as supporting the "fair and
clear warning" rule.  131 S. Ct. at 2086-87 (Kennedy, J., concurring).
Further, Justice Kennedy's dissenting opinion in *Camreta* recognizes the
continuing vitality of *Hope*: "Our cases make clear, moreover, that 'officials
can still be on notice that their conduct violates established law even in novel
factual circumstances.'  [*Hope*, 536 U.S. at 741].  That rule permits clearly
established violations to be found when extreme though unheard-of actions
violate the Constitution.  *See, e.g.*, [*id.*]." 131 S. Ct. at 2044 (Kennedy, J.,
dissenting).

In sum, pursuant to the line of cases described above, I believe that
certain official conduct may so obviously fall within the prohibition of a
general or abstract rule of the Constitution that any reasonable official would
have "fair warning" that his actions are unconstitutional, even absent a prior

## No. 09-40373

court decision to that effect.  However, I agree with Judge Benavides that this case does not present a situation where the defendants had fair warning that their actions were unconstitutional, for substantially the reasons given by Judge Benavides in his opinion. Public school authorities, as state actors, must abide by the First Amendment.  Consequently, they may not adopt any law or regulation "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech" insofar as schoolchildren are concerned.  U.S. Const. amend. I.  In our pluralistic society, the First Amendment requires that public school officials take care not to infringe upon the rights of parents to shape and nurture the religious beliefs and practices of their very young children and, correspondingly, not to adopt school regulations or policies that tend to establish a religion.  At the same time, public school officials must also respect the rights of schoolchildren to the free exercise of religion, and to the freedom of speech. Because the challenged state actions in this case do not appear to conflict with any of these First Amendment commands at its core, but to fall in areas where the commands reasonably appear to be in conflict and thus are in need of further definition, I agree that the principals and teachers are entitled to qualified immunity in this case.

No. 09-40373

EDWARD C. PRADO, Circuit Judge, partially concurring:

I agree that *Tinker* and its progeny clearly establish that elementary-school students enjoy some degree of First Amendment rights at school. This includes a general, but not unrestricted, right to express personal, religious views and to be free from viewpoint discrimination. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). The Supreme Court was sweeping in its pronouncement that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. Based on the nature of the restriction in *Tinker*, a school policy forbidding students to wear armbands to protest the Vietnam War, *id.* at 504, and the Court's broad language, this declaration surely encompasses a general prohibition on viewpoint discrimination that extends to *all* students. Thus, I join Section III-A of Judge Elrod's opinion.

Context matters significantly, however, in the intersection of the First Amendment, elementary education, and qualified immunity. In *Hazelwood*, the Supreme Court reaffirmed that the First Amendment "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (quoting *Tinker*, 393 U.S. at 506). Particularly, the Court held that schools may exercise greater control over "activities [that] may fairly be characterized as part of the school curriculum," in part because of a concern that "the views of the individual speaker [might be] erroneously attributed to the school." *Id.* at 272. While the *Hazelwood* case dealt with a high-school newspaper, the Third Circuit has presciently noted that when applying the *Hazelwood* test "[i]n the elementary school setting, age and context are key." *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 275 (3d Cir. 2003). The ability of high-school students to express

opinions about political and social issues, and to distinguish between the speech of other students and the school, must be considered in contrast to the abilities of much younger students. Young students may easily confuse student advocacy in the classroom or during other school-organized activities for school-endorsed speech. *See id.* at 277 (noting that "in an elementary school classroom, the line between school-endorsed speech and merely allowable speech is blurred, . . . for [ ] young, impressionable students"). Lacking clearer guidance from the Supreme Court on the application of *Tinker* and *Hazelwood* in the elementary-school context, we should tread carefully in exposing school officials charged with making sensitive, context-specific decisions to personal liability.

Nonetheless, the incidents described in the complaint involving Principal Bomchill's attempts to restrict Versher's distribution of (1) religious materials on the school lawn after school and (2) play tickets outside of class to students who expressed interest do not reasonably fall into this gray area where students might have confused Versher's speech for that of the school, *see Hazelwood*, 484 U.S. at 272, or where Versher's actions might have interfered with the school's ability to preserve order or facilitate learning. *See Tinker*, 393 U.S. at 514. At this stage of the proceedings, I would therefore affirm the denial of qualified immunity on these two incidents.[1]

The other two incidents—involving distribution of religious materials (1) at a "winter break party" inside the classroom and (2) at a half-birthday party facilitated by the school—are not so clear-cut. Given the risk of young students imputing religious speech to the school, and the similarities between the facts in the latter incident and *Walz*, Bomchill's and Swanson's actions

---

[1] The district court may later find that qualified immunity is warranted on one or both of these incidents after further factual development in this case.

were not objectively unreasonable in light of clearly-established law.  I would therefore grant qualified immunity with respect to those incidents.

No. 09-40373

PRISCILLA R. OWEN, Circuit Judge, specially concurring:

I join the specially concurring opinion of Chief Judge Jones, except to the extent that it adopts all of Part III of Judge Elrod's dissenting opinion. I cannot agree that the law is well-settled regarding the First Amendment rights of elementary school children, for the reasons set forth in Judge Benavides' opinion. Nor do I agree with the conclusion in Part III(B) of Judge Elrod's opinion that the principals have waived the arguments discussed in that section. However, I agree with much of Part III(A) of Judge Elrod's opinion, though I do not join that section of her opinion. I do join Parts III(C) and III(D) of Judge Elrod's opinion. I read Part III(D) as addressing the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[1]

I also join in Parts II, III, and IV of Judge Benavides' opinion.

---

[1] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

56

No. 09-40373

JENNIFER WALKER ELROD, Circuit Judge, writing for the majority with respect to Sections III.A, III.C, and III.D, and dissenting in remaining part:[**]

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). That schools are "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

This appeal may only involve two students and two principals in a suburban school district in Texas, but it concerns conduct that "strikes at the very heart of the First Amendment"—discrimination against student speech solely on the basis of religious viewpoint. *See Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring).[1] Viewpoint discrimination is a "blatant" violation of our First Amendment right to free speech, for it censors "particular views taken by speakers on a subject." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). At the core of the First Amendment's right to free speech is the right of one student to express a religious viewpoint to another student without fear. We hold that this right—to engage in private, non-disruptive, student speech—is protected from viewpoint discrimination under the First Amendment, and that the right extends to elementary-school

---

[**] Judges Smith, DeMoss, Clement, and Haynes join this opinion in full. Chief Judge Jones and Judges Jolly and Southwick join in Sections III.A, III.C, and III.D. Judge Prado joins in Sections III.A, III.C, IV.B, and IV.C. Judge Owen joins in Sections III.C and III.D.

[1] *See also Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (deeming Justice Alito's opinion controlling).

No. 09-40373

students. I would also hold that this right is clearly established under existing law. Therefore, I would affirm the district court's denial of the motion to dismiss because the facts alleged in the complaint do not entitle Principals Bomchill and Swanson to qualified immunity.

## I.

On this interlocutory appeal of a motion to dismiss, we must accept as true the facts as pleaded in the complaint, view them in the light most favorable to the students, and draw all reasonable inferences in favor of the students. *See Brown v. Nationsbank Corp.*, 188 F.3d 579, 585-86 (5th Cir. 1999).

## A.

This case involves two principals, Lynn Swanson and Jackie Bomchill, two students, Stephanie Versher and Jonathan Morgan, and four separate incidents involving the principals' censorship of student speech.[2] Three of the incidents involved fifth-grader Stephanie and Principal Bomchill. The fourth incident involved third-grader Jonathan and Principal Swanson. As to each of these incidents, the complaint alleges that the principals acted not only pursuant to a written policy, but also pursuant to unwritten "customs" and "practices," which treated religious viewpoints differently from all other viewpoints, when they discriminated against religious viewpoints in favor of non-religious ones.

Incident One

At all relevant times, Stephanie was enrolled in the fifth grade at Rasor Elementary School, part of the Plano Independent School District (Plano ISD)

---

[2] The complaint also alleges that the principals censored parent speech, but those claims were not subject to the motion to dismiss and remain pending before the district court. In addition, the complaint asserts claims against Plano ISD. A number of these claims, including an as applied challenge to the 2004 Policy (the relevant policy in this case), violations of the U.S. Constitution, the Texas Constitution, and the Texas Religious Freedom Restoration Act (TRFRA), remain pending before the district court.

in Texas. In January 2004, "while at school but during non-curriculum times and with no material and substantial disruption to the operations of the school," Stephanie talked to her friends and classmates about a drama being put on at a local church. If a student expressed a desire to attend, Stephanie would give that student a free ticket. After she had given out several tickets, Principal Bomchill learned of her actions and instructed school officials to prevent Stephanie from giving out any more tickets and to confiscate any tickets that she had already given to her classmates. School officials collected and discarded those tickets. Bomchill notified Stephanie's mother that the tickets were not allowed because they expressed a religious viewpoint and later told her that if Stephanie attempted to share the tickets again on school property, Stephanie would be "kicked out of school." No other reason was given.

Incident Two

In the same month, on January 16, 2004, Stephanie wanted to share brownies and two pencils with her friends in the cafeteria during her half-birthday party. Plano ISD permits students to celebrate their birthdays with parties at school. Students with summer birthdays may celebrate their half-birthdays during the school year with their classmates while at school. Celebrants often distribute snacks and small gifts to their classmates. In the past, school officials have permitted students to share a Chinese bookmark with a printed message on it, a Lion King ring with words and symbols, a bracelet, and pencils with various words and symbols, including the commercial statement "Where's Hippo?" The parties are celebrated during "non-curriculum times" at school—"primarily at the end of the lunch period or during a snack break between instructional time." For her half-birthday party, Stephanie had brought brownies, along with two pencils, one inscribed with the word "moon" and another inscribed with the phrase "Jesus loves me this I know for the Bible tells me so." Stephanie's mother unsuccessfully attempted to meet with

No. 09-40373

Principal Bomchill prior to the party to discuss the snacks and gifts, so on the day of the party, Stephanie's mother took the pencils and brownies to the school's office and requested to see Bomchill. As she entered the school's office, Stephanie's mother received a letter accusing her of distributing material to students on school property and threatening that "law enforcement officials" would be called to arrest her.[3]

Bomchill also threatened that, if Stephanie shared any more materials that expressed a religious viewpoint while on school property, the school would call the police and Stephanie "would be in trouble." Bomchill forbade Stephanie from giving her friends the "Jesus" pencils, but gave her permission to share the brownies and the "moon" pencils. According to Bomchill, such "religious" material (i.e., the tickets and "Jesus" pencils) could only be distributed "outside of the school building." Stephanie's mother removed the "Jesus" pencils from the tie wrapping the brownies and brought the brownies and "moon" pencils to Stephanie so that she could share them with her friends during her half-birthday party in the school cafeteria during lunch break. Stephanie asked her mother what happened to the "Jesus" pencils. Her mother replied that Principal Bomchill would not allow her to give those pencils to her friends at the party, and that she could only share those pencils with her friends after school outside of the building. Her mother gave her the "Jesus" pencils she had removed from the brownies and instructed her to keep them in her backpack until school was over.

Incident Three

---

[3]    The school's security guard followed Stephanie's mother as she was leaving the school building. As she exited the building, she noticed that two police cars were driving toward the school. When she drove away, the police followed her and pulled her over. The officers let her go without incident.

No. 09-40373

Later that day, after school hours, outside of the school on the sidewalk and lawn, Stephanie was talking to some of her friends. As she reached over to one of her best friends to share one of the "Jesus" pencils, Bomchill saw Stephanie and grabbed her shoulder. Bomchill confiscated the pencil and scolded Stephanie. Despite Bomchill's earlier statement that Stephanie could share the pencils after school outside of the school building, she told Stephanie that she could not give out the pencil on school property at all because it expressed a religious viewpoint. Bomchill then told Stephanie's mother that if Stephanie tried to give out these pencils again, she would be "kicked out of school."

Incident Four

The remaining incident involved Principal Swanson of Thomas Elementary School—also in Plano ISD—and one student, third-grader Jonathan Morgan. Each elementary school classroom in Plano ISD hosts a "winter break" party at which students, if they so choose, may exchange "goodie bags" containing gifts. For his upcoming December 2003 "winter break" party, Jonathan wanted to give his classmates goodie bags containing candy-cane shaped pens along with a laminated card entitled the "Legend of the Candy Cane" that explained the Christian origin of candy canes. Each bag would be individually addressed to a specific classmate with a tag specifying that the gift was from Jonathan.

Jonathan's parents, Doug and Robin Morgan, were aware that in the past, Plano ISD, Swanson, and other school officials at Thomas Elementary School had prevented students from including "religious" materials in their goodie bags for the "winter break" parties. For example, Michaela Wade, another student at Thomas, wanted to include a pencil inscribed with the phrase "Jesus is the Reason for the Season" in her goodie bags at a 2001 "winter break" party. School officials would not allow her to include the pencils in her goodie bags because of

No. 09-40373

their religious message, but did permit her classmates to pass out goodie bags containing gifts inscribed with secular phrases and symbols,[4] such as snowmen and snowflakes.

Given this history, Doug and Robin Morgan decided to meet with Swanson several weeks before the "winter break" party, in order to determine whether she would allow Jonathan to share his candy canes in his goodie bag. According to the complaint, the Morgans discussed with Swanson how

> students and parents are being interrogated by school officials at the "winter break" parties as to whether or not the contents of their gift or "goodie" bags—which they have brought to school to distribute to their classmates during the "winter break" party—contain any religious viewpoint, religious references or religious message and if the students or their parents acknowledged that the gift bags do contain religious messages or religious viewpoint materials, the bags are then confiscated by school officials and are banned from the classroom and prohibited from being distributed by the students while they are on school property.

The Morgans also complained to Swanson that students and parents were not being allowed to bring red and green materials to the "winter break" party, and that students were not allowed to write "Merry Christmas" on greeting cards to U.S. soldiers fighting abroad and to retirement homes. Swanson said she would investigate these claims. Swanson also confirmed that in the past, school officials had confiscated items deemed "religious" but had permitted "secular" items and school officials would continue to do so in the future. When asked about Jonathan's intended gift, Swanson indicated that he could share the candy

---

[4] Although in modern usage the term "secular" is often used as an antonym for "sacred" or "religious," scholars have observed that, originally, the term secular was actually a religious concept. *See generally* Steven D. Smith, *Constitutional Divide: The Transformative Significance of the School Prayer Decisions*, 38 Pepperdine L. Rev. 945, 973 (2011). Classically, "secular" was the term used by lay people and ecclesiastics alike "to refer to the here and now of this world, understood as a specialized area of God's domain." *Id.* (internal quotation marks omitted). Understood in that way, even medieval governments were secular—that is, they concerned themselves with the government of this world, and not the next.

canes with his classmates only if he removed the laminated cards containing the religious message. Doug Morgan also asked Swanson if he could share the Legend of the Candy Cane cards with other interested parents present at the party. Swanson refused his request.

On the day of the party, Jonathan and his father unsuccessfully attempted to meet with Swanson and then proceeded to Jonathan's classroom. Jonathan's teacher met them at the door and prevented Jonathan from bringing his goodie bags into the classroom to exchange with his classmates because they contained "religious" messages. Once Swanson arrived at Jonathan's classroom and was apprised of the situation, she immediately informed the Morgans that Jonathan could place his goodie bags in the school library or he could distribute his goodie bags on a public sidewalk off of school property. Swanson later announced to the entire school that students were not allowed to bring any outside materials into the classrooms. Despite having just observed other outside materials in Jonathan's classroom, however, she never required the other students to remove their gift bags from the classroom and place them in the library. All of Jonathan's other classmates were allowed to exchange gift bags inside the classroom. Swanson only prohibited students from exchanging materials that contained a "religious" viewpoint. Swanson allowed students to exchange other materials, and, other than noting the "religious" nature of the materials, Swanson offered no justification for her censorship of Jonathan's speech.

**B.**

This case is before us on an interlocutory appeal of a denial of a motion to dismiss. The students filed a complaint alleging violations of the First and Fourteenth Amendments, as well as of Article 1, § 8 of the Texas Constitution.[5]

---

[5] Specifically, the complaint alleges four federal causes of action under 42 U.S.C. § 1983—violations of the First Amendment's Free Speech, Free Exercise, and Establishment Clauses, as well as violations of the Fourteenth Amendment's Equal Protection Clause—and

No. 09-40373

The principals filed a motion to dismiss before the district court on qualified immunity grounds. Recognizing that "for the purposes of this motion to dismiss, the Court must accept the allegations contained in the [complaint] that Defendants practiced viewpoint discrimination against Plaintiffs' religious speech," they argued that elementary school students do not have First Amendment rights. The principals "contend[ed] that the First Amendment free speech protections do not apply to elementary schools or, alternatively, that, as a matter of law, elementary schools are permitted to practice viewpoint discrimination so as to exclude religious messages from elementary schools." The magistrate judge rejected the principals' assertion, noting that it was a "novel and specious argument that elementary school students have no constitutional rights in the area of free speech" and recommended that the district court deny their motion to dismiss—a recommendation that the district court adopted in full.

After the magistrate judge and the district court dismissed their argument that "First Amendment free speech protections do not apply to elementary schools," the principals appealed to this court. On appeal, the principals urged the panel to reverse the district court on qualified immunity because, as stated in their issue presented, "[t]he First Amendment is not implicated by restrictions on student-to-student distribution of non-curricular materials by elementary school students to their classmates." In addition, the principals asserted that they are entitled to qualified immunity because neither "this [c]ourt nor the Supreme Court has ever upheld a First Amendment free speech claim by an elementary school student." A unanimous panel of this court, like the district court and the magistrate judge, rejected their argument, holding that

---

two state causes of action—violations of Title V of the Texas Civil Practice and Remedies Code and Article 1, § 8 of the Texas Constitution.

"it has been clear for over half a century that the First Amendment protects elementary school students from religious-viewpoint discrimination."

The principals petitioned for rehearing *en banc*, arguing that it was not clearly established that elementary school students had a First Amendment right to be free from viewpoint discrimination, and that the prohibition on viewpoint discrimination did not apply to religious speech. This court granted rehearing *en banc*.

## II.

This court has jurisdiction to review the district court's denial of the principals' motion to dismiss based on qualified immunity under 28 U.S.C. § 1291 and the collateral-order doctrine, but only to the extent that the appeal turns on questions of law. *Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985). We review a district court's determination of a motion to dismiss *de novo*. *In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008). For a complaint to avoid being dismissed for failure to state a claim, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" and the non-moving party must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Here, the principals' motion to dismiss before the district court was based on a claim of qualified immunity, which "is an *immunity from suit* rather than a mere defense to liability." *Mitchell*, 472 U.S. at 526. Qualified immunity does not provide officials with a license to engage in lawless conduct, however. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Rather, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* "Qualified

65

immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Therefore, qualified immunity protects government officials performing discretionary functions from individual liability for civil damages, but only "insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818; *see also Thompson v. Upshur Cnty.*, 245 F.3d 447, 456-57 (5th Cir. 2001).

At this early pleading stage, our factual universe is bounded by the four corners of the complaint. *See Brown*, 188 F.3d at 585-86. In other words, we must determine whether the principals are entitled to qualified immunity based on the facts alleged in the complaint, which we must accept as true, drawing all reasonable inferences in favor of the students. *Id.* We lack jurisdiction to resolve disputed factual issues or consider whether such disputes might entitle the principals to qualified immunity. *See Roe v. Tex. Dep't of Protective and Regulatory Servs.*, 299 F.3d 395, 400 (5th Cir. 2002).

## III.

The first prong of qualified immunity asks whether the principals' alleged conduct violated a statutory or constitutional right. *See al-Kidd*, 131 S. Ct. at 2080. Under *Pearson v. Callahan*, courts have discretion to decide which of the two prongs of qualified immunity to tackle first. 555 U.S. 223, 236 (2009). Although courts should "think hard" before exercising this discretion, "it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 131 S. Ct. 2020,

No. 09-40373

2032 (2011).[6] Here, the students argue that the principals violated their First Amendment rights by discriminating against their speech because of its religious viewpoint. Based on the facts alleged, we agree.

## A.

The First Amendment protects an individual's right to speak freely, a right whose value lies in the fact that it defends equally all viewpoints, even disfavored ones. Thus, viewpoint discrimination "strikes at the very heart of the First Amendment." *Morse*, 551 U.S. at 423 (Alito, J., concurring). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. This prohibition is so well-established as to be "axiomatic." *Id.* at 828. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *Barnette*, 319 U.S. at 642.

The right to be free from viewpoint discrimination is no less important in our public schools. Our public school officials "influence the attitudes of students toward government, the political process, and a citizen's social responsibilities." *Ambach v. Norwick*, 441 U.S. 68, 79 (1979). Our schools are tasked with "inculcat[ing] the habits and manners of civility." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). The habits and manners of a free people include tolerance and consideration of a range of political and religious views.

For these reasons, the Supreme Court held over forty years ago that the First Amendment prohibits viewpoint discrimination against all students in public schools, absent material and substantial disruption. *See Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 509 (1969). Students do not "shed their

---

[6] At oral argument, the principals indicated that guidance in this area from our court would be helpful to public officials.

constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. In *Tinker*, the principals of the Des Moines schools became aware of a plan by students to wear armbands protesting the Vietnam War. *Id.* at 504. They adopted a policy that any student wearing such an armband would be asked to remove it or face suspension. *Id.* Seven students decided to defy the policy, including eight-year-old Paul Tinker, eleven-year-old Hope Tinker, and thirteen-year-old Mary Beth Tinker. *Id.* at 516 (Black, J., dissenting).

The Supreme Court upheld the rights of those students against the school's efforts to prohibit the students from speaking their minds, holding that "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511. The Court even characterized this holding as "obvious":

> If a regulation were adopted by school officials forbidding discussion of the Vietnam conflict, or the expression by any student of opposition to it anywhere on school property except as part of a prescribed classroom exercise, it would be obvious that the regulation would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school.

*Id.* at 513.

Thus, under *Tinker*, school officials may not restrict student speech on school property solely on the basis of viewpoint, unless there is a showing of material and substantial disruption. *See id.* This holding was not revolutionary, even in 1969.[7] Indeed, almost thirty years before *Tinker*, the Supreme Court

---

[7] Even before *Tinker* was decided, this court warned: "[S]chool officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and school rooms do not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Burnside v. Byars*, 363 F.2d 744, 749

No. 09-40373

recognized that school officials are subject to the Constitution, and that the Free Speech Clause of the First Amendment is no exception. *See Barnette*, 319 U.S. at 642. *Barnette* involved two sisters who were in elementary school. They challenged a West Virginia statute that required every child within the State's public school system to salute the American flag. As practicing Jehovah's witnesses, the Barnett[8] sisters believed that pledging allegiance to the flag was a prohibited form of idol worship. *Id.* at 629. After they declined to participate in the ceremony, the school expelled them. *Id.* at 630. The Supreme Court struck down the West Virginia statute and established the bedrock principle that the First Amendment applies to all public school students: "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. . . . That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."[9] *Id.* at 637.

Since *Tinker* and *Barnette*, the Supreme Court has consistently reinforced the notion that First Amendment rights are of paramount importance in school facilities. *See, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) (holding that a school violated the First Amendment when it prohibited

---

(5th Cir. 1966).

[8] We use the correct spelling of the Barnett surname, which does not match the case caption because courts misspelled the surname as "Barnette" during the litigation.

[9] Although *Barnette* involves compelled speech and this case involves compelled silence, the Supreme Court has explicitly stated that any distinction between "compelled speech" and "compelled silence" is "without constitutional significance." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

a private Christian organization for children aged six to twelve from holding meetings at the school for the purpose of singing Christian songs, hearing Bible lessons, and memorizing scripture); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393-94 (1993) (holding that the prohibition of Christian perspective speech in a school facility constituted unconstitutional viewpoint discrimination); *Widmar v. Vincent*, 454 U.S. 263, 265, 267 (1981) (holding that a public university could not "close its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion").

In its most recent school speech case, *Morse v. Frederick*, the Supreme Court reaffirmed *Tinker*'s maxim that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Morse*, 551 U.S. at 422 (Alito, J., concurring). Justice Alito's controlling opinion observed that giving "public school authorities a license to suppress speech . . . based on disagreement with the viewpoint expressed" would "strike[] at the very heart of the First Amendment." *Id.* at 423. Thus, "[w]hen the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is . . . blatant." *Rosenberger*, 515 U.S. at 829; *see also id.* ("Viewpoint discrimination is . . . an egregious form of content discrimination.").[10]

---

[10] Indeed, the Supreme Court in recent Terms has made it clear that the First Amendment has a broad reach, limited only by narrow, traditional carve-outs from its protection. Most recently, the Court held that California's statute prohibiting the sale of violent video games to minors was a content-based restriction that violated the minors' First Amendment rights. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2736, 2741-42 (2011) (the State possesses no "free-floating power to restrict the ideas to which children may be exposed."). The Court concluded that laws imposing unjustified restrictions on children's speech and religious freedom are manifestly unconstitutional. *See id.* at 2736 n.3 ("In the absence of any precedent for state control, uninvited by the parents, over a child's speech and religion (Justice Thomas cites none), and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional."). The Court also held last Term that the First Amendment shields hateful protestors from tort liability for picketing

No. 09-40373

Even in the face of *Barnette, Tinker*, and *Morse*, the principals contend that the First Amendment does not protect elementary school students from viewpoint discrimination—an assertion belied by the facts of the cases themselves. The Barnett sisters were in elementary school and are described in the opinion as "little children." *Barnette*, 319 U.S. at 644. And in *Tinker*, two of the defying students in *Tinker* were eight-year-old Paul Tinker, and his sister, eleven-year-old Hope Tinker. 393 U.S. at 516 (Black, J., dissenting). Although they were not named plaintiffs in the litigation, the school regulation and policy at issue in *Tinker* that the Court struck down applied to them, as well as to all other students. *See id.* In fact, the petition for certiorari in *Tinker*, "urg[ed] that the First and Fourteenth Amendments protect the right of school pupils to express their political views all the way 'from kindergarten through high school.'" *Id.*[11]

Like the Supreme Court, this court has never limited the First Amendment rights of students due to age. Most recently, in a related case, this court applied the *O'Brien* "time, place, and manner" test to Plano ISD's policy regulating student-to-student distribution of non-curricular materials in elementary schools—a test that would have been inappropriate had the court

---

funerals of service members, confirming our commitment "to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 131 S. Ct. 1207, 1220 (2011). Two Terms ago, the Court protected portrayals of animal cruelty, *United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010), firmly rejecting the government's invitation to analyze free speech on cost-benefit terms, *see id.* at 1585-86, and held that the government may not suppress political speech on the basis of the speaker's corporate identity. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 913 (2010).

[11] Justice Black's dissent further illustrates that the Court's decision in *Tinker* applied to elementary school students: "[I]f the time has come when pupils of state-supported schools, kindergartens, grammar schools, or high schools, can defy and flout orders of school officials to keep their minds on their own schoolwork, it is the beginning of a new revolutionary era of permissiveness in this country fostered by the judiciary." *Id.* at 518 (Black, J., dissenting).

71

No. 09-40373

concluded that elementary school students are not protected by the First Amendment. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009); *see also Pounds v. Katy Indep. Sch. Dist.*, 730 F. Supp. 2d 636, 639 (S.D. Tex. 2010) (rejecting a school's effort to remove a religious Christmas card option from the choices available to elementary school students creating cards for their friends); *cf. A.A. v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 272-73 (5th Cir. 2010) (applying the Texas Religious Freedom Restoration Act to the claims of a kindergarten student to vindicate the child's rights to wear his hair long in school). In addition to the Supreme Court and this court, numerous other circuits have also rejected claims that the First Amendment does not apply to elementary school students.[12]

---

[12] *See, e.g.*, *Frazier v. Winn*, 535 F.3d 1279, 1281-83 (11th Cir. 2008) (finding that all Florida public school students "at all grade levels from kindergarten to twelfth grade" have the First Amendment right not to stand during the Pledge of Allegiance); Curry v. Hensiner, 513 F.3d 570, 576-77 (6th Cir. 2008) (applying *Hazelwood*'s First Amendment framework in the elementary school setting); *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625-29, 633 (2d Cir. 2005) (applying the *Hazelwood* framework in the kindergarten setting to conclude that certain speech was "school-sponsored" but nevertheless holding that "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests"); *Hosty v. Carter*, 412 F.3d 731, 735 (7th Cir. 2005) (en banc) ("The Supreme Court itself has established that age does not control the public-forum question. . . . [N]o public school, of any level—primary, secondary, or post-secondary—may discriminate against religious speech in a public forum (including classrooms made available to extracurricular activities) . . . . *Hazelwood*'s framework applies to . . . elementary and secondary schools." (citations omitted)); *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 280 (3d Cir. 2003) ("[E]lementary school students retain certain First Amendment rights of expression."); *Walker-Serrano v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003) (concluding that although age is a factor, "this calculus does not [necessarily] mean that third graders do not have First Amendment rights under *Tinker*"); *Brown v. Gilmore*, 258 F.3d 265, 278 (4th Cir. 2001) ("Despite language in Supreme Court precedent recognizing the impressionability of elementary school children . . . nothing the Court has said 'suggest[s] that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.'" (quoting *Good News Club*, 533 U.S. at 116); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538 (7th Cir. 1996) (recognizing that "religious speech cannot be suppressed solely because it is religious . . . , a principle that makes sense in the elementary school environment"); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993) ("[N]othing in

72

No. 09-40373

## B.

The principals have raised a number of new arguments before the *en banc* court; all of them are waived. Our well-established rule is that "arguments not raised before the district court are waived and will not be considered on appeal." *Celanese Corp. v. Martin K. Eby Const. Co.,* 620 F.3d 529, 531 (5th Cir. 2010); *see also French v. Allstate Indem. Co.*, 637 F.3d 571, 582-83 (5th Cir. 2011). That principle is especially relevant when a case reaches *en banc* consideration. *See Franks Inv. Co. LLC v. Union Pacific R. Co.*, 593 F.3d 404 (5th Cir. 2010) (en banc) (observing that "[t]oday is too late" to consider a theory raised for the first time *en banc*) (citing *United States v. Brace*, 145 F.3d 247, 250 (5th Cir. 1998) (en banc); *see also United States v. Lucas*, 499 F.3d 769, 792 (8th Cir. 2007) (Beam, J., dissenting) ("[C]onsideration of these new issues for the first time by the en banc court will have the effect of making the district court trial and the three-judge panel's consideration of the issues asserted in the first appeal merely a 'tryout on the road,' leaving open the option of presenting a newly created script when the en banc court becomes the intended audience.").

The sole question properly before this court is the only one the principals raised before the panel: Is it clearly established that elementary school students have First Amendment rights? Throughout this litigation, the principals have insisted that the answer to that question is "no." Thus, according to the principals, because "First Amendment free speech protections do not apply to elementary schools," their decision to discriminate solely on the basis of religious viewpoint was permissible.

This broad dismissal of the elementary school students' free speech rights—that, simply put, they have none—has been at the core of the principals'

---

the [F]irst [A]mendment postpones the right of religious speech until high school.").

defense from the very beginning of this case. They pursued that same argument in their motion to dismiss,[13] in their reply to plaintiffs' response to the motion to dismiss,[14] in their supplement to their motion to dismiss,[15] in their reply to plaintiffs' response to defendant's supplement,[16] in their objections to the magistrate's report,[17] in their reply to plaintiffs' response to their objections,[18] in their brief on appeal,[19] and in their reply brief on appeal.[20] When asked at oral argument whether their argument was that "elementary school kids do not

---

[13] "[N]either the United States Supreme Court nor the Fifth Circuit has ever held that the First Amendment free speech protections apply to elementary schools such that it is unconstitutional for public officials to practice viewpoint discrimination against religious speech in elementary schools." Mot. to Dismiss at 2.

[14] "The most obvious and important 'special characteristic' of elementary schools is the tender age of the students." Reply to Pls. Resp. to Mot. to Dismiss at 2.

[15] "Neither the Supreme Court nor the Fifth Circuit has ever upheld a First Amendment free speech claim by an elementary school student." Supp. to Mot. to Dismiss at 1.

[16] "[E]lementary school students do not have a First Amendment free speech right to distribute non-curricular materials to their classmates during the school day . . . ." Defs. Reply to Pls. Response to Supp. Mot. to Dismiss at 5.

[17] "[N]either the Supreme Court nor the Fifth Circuit has ever extended the First Amendment 'freedom of speech' to the distribution of non-curricular materials in public elementary schools . . . ." Defs. Obj. to Magistrate's Rep. at 2.

[18] "[P]ublic elementary school children do not have a constitutionally protected right to distribute non-curricular materials to other students at school . . . ." Defs. Reply to Pls. Resp. To Obj. to Magistrate's Rep. at 1.

[19] "[T]here have been no decisions from this Court holding that First Amendment free speech protections apply in public elementary schools." Appellants' Br. at 28. In addition, the issue statement from their opening brief on appeal reads: "[T]he First Amendment free speech clause is not implicated by restrictions on elementary school student-to-student distribution of non-curricular materials."

[20] "The tender age of elementary schoolchildren and the unique role their schools play in nurturing them counsels strongly against such an extension of the First Amendment." Appellants' Reply Br. at 1.

74

No. 09-40373

have a First Amendment right," their counsel responded, "Yes." Thus, at every stage before *en banc*, the principals have advanced the same qualified-immunity argument. Adopting the maxim that the simplest explanation is likely to be the correct one, that bold strategy was probably not the result of inartful briefing. After all, they made the same argument before a different panel of this court. *See Morgan*, 589 F.3d at 744 ("Defendants Lynn Swanson and Jackie Bomchill, Principals at Thomas Elementary School and Rasor Elementary School, urge that the First Amendment does not apply to elementary school students."), *cert. denied*, 130 S. Ct. 3503 (2010). Besides, had they not pursued this strategy, they would have been stuck defending blatant viewpoint discrimination.

Whatever the reason, we should hold the principals to the position they took before every court that has decided this case to date. Limited to the question properly before this court, the answer is clear: elementary school students do have First Amendment rights under clearly established law. *See supra* Section III.A. The magistrate judge, the district court, and a unanimous panel of this court, at this 12(b)6) stage, agreed. Every member of this court also agrees, and no circuit has ever held otherwise.[21] On this basis alone, I would affirm the district court's denial of the motion to dismiss.

## C.

Nevertheless, because a majority of this court would not find waiver, we must consider the principals' other *en banc* arguments. The principals contend that one of the limited exceptions that the Supreme Court has carved out to students' First Amendment speech rights arguably applies here, and therefore

---

[21] At oral argument before the panel, counsel for the principals could not identify any case holding that elementary students have no First Amendment rights. Even where other circuits have placed restrictions on student speech, they have acknowledged that elementary school students have First Amendments rights. *See supra* n.11.

No. 09-40373

their decision to restrict speech was permissible. The Court has delineated five narrow exceptions for when school officials may restrict specific student speech:

> School regulation of student speech can be justified on five . . . grounds. If the speech is disruptive (*Tinker*), lewd (*Fraser*), school-sponsored (*Hazelwood*), or promoting drug use (*Morse*), schools may in some instances restrict specific student speech. Student speech can also be regulated so long as the regulation is viewpoint- and content-neutral (*Canady*).

*Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 509 (5th Cir. 2009).

However, of these five grounds, the Court has only expressly held that one permits school officials to engage in viewpoint discrimination—where the student speech is substantially and materially disruptive. *See Tinker*, 393 U.S. at 513.[22] The principals here do not contend that the speech at issue in the four incidents was substantially and materially disruptive, lewd, or promoted drug use. More importantly, there are no factual allegations in the complaint to support such a contention. Instead, the principals assert that the speech is "arguably" school-sponsored, or in the alternative, that the school officials discriminated based on viewpoint in order to avoid an Establishment Clause violation. The Supreme Court has not determined whether school officials may engage in viewpoint discrimination in cases where the speech is school-sponsored[23] and in *Good News Club*, the Court expressly left open that same

---

[22] In *Morse*, the Court allowed school officials to restrict speech that promoted "illegal drug use." 551 U.S. at 403. The Court made clear that this was "not a case about political debate over the criminalization of drug use or possession," nor did the speech convey "any sort of political or religious message." *Id.* at 402-403. Indeed, Justice Alito observed that the "special characteristic that is relevant in this case is the threat to the physical safety of students." *Id.* at 424.

[23] Although some of our sister circuits have intimated that viewpoint discrimination may be constitutionally permissible in the context of school-sponsored speech, neither our circuit nor the Supreme Court has ever held as much. Indeed, given the Supreme Court's harsh criticisms of viewpoint discrimination—which it has labeled a "blatant" violation of the Free Speech Clause—we have serious doubts about the constitutionality of the practice, even

No. 09-40373

question as to avoiding Establishment Clause violations.  *See* 533 U.S. at 113 (noting that "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination."). Regardless, the speech at issue here is neither actually nor "arguably" school-sponsored, nor does it implicate the Establishment Clause.

*Hazelwood School District v. Kuhlmeier* sets out the parameters for what constitutes school-sponsored speech.  *See* 484 U.S. 260 (1988).  In *Hazelwood*, the school principal censored two articles in the school newspaper: one concerning students' experiences with pregnancy, and the other regarding the impact of divorce on students at the school.  *Id.* at 263.  The school newspaper was funded by the school, and the school's journalism teacher "selected the editors of the newspaper, scheduled publication dates . . . edited [the] stories, selected and edited the letters to the editor, and dealt with the printing company," and had "final authority with respect to almost every aspect of the production and publication of [the paper], including its content."  *Id.* at 268 (quoting *Kuhlmeier v. Hazelwood Sch. Dist.*, 607 F. Supp. 1450, 1453 (E.D. Mo. 1985)).  School policy expressly provided that the publication was "developed within the adopted

in the *Hazelwood* context.  *See Rosenberger*, 515 U.S. at 828-29.  "Schools cannot constitutionally interpret their basic educational mission as requiring the suppression of religious speech."  Douglas Laycock, *High-Value Speech and the Basic Educational Mission of a Public School: Some Preliminary Thoughts*, 12 Lew. & Clark L. Rev. 111, 124 (2008). Allowing schools to suppress particular viewpoints would teach students a distorted and dangerous lesson about the relationship between citizen and government.  *See Ambach*, 441 U.S. at 79 (school officials "influence the attitudes of students toward government, the political process, and a citizen's social responsibilities").  Students would learn that the government favors certain viewpoints over others and that religious viewpoints are the most disfavored of all.  *See Lubbock Civil Liberties Union v. Lubbock Indep. Sch. Dist.*, 680 F.2d 424, 426 (5th Cir. 1982) (reh'g en banc denied) (Reavley, J., dissenting) ("We should not forget, however, that the young student may also be given the impression that our government and the courts and the schools are hostile to all religious belief and practice."). Nevertheless, we need not resolve the question to decide this case, as the speech here is private, non-disruptive, non-curricular student-to-student speech, rather than school-sponsored speech.

No. 09-40373

curriculum and its educational implications in regular classroom activities." *Id.* (internal quotation marks ommitted).

The Supreme Court observed that the question at issue in *Hazelwood* was not about an "educators' ability to silence a student's personal expression that happens to occur on school premises," expression which is protected under *Tinker*, but about "whether the First Amendment requires a school affirmatively to promote particular student speech." *Id.* at 270-71. The Court held that educators may exercise greater control over "these activities [that] may fairly be characterized as part of the curriculum," which are "supervised by faculty members," and designed to impart particular knowledge or skills so "that the views of the individual speaker may not be erroneously attributed to the school," such as in a school newspaper or a school play. *Id.* at 271. The Court set out this exception to the First Amendment's protection of student speech: "[W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in  school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns"—activities such as a "school-sponsored publication" or a "theatrical production." *Id.* at 273.

Like all exceptions to the First Amendment's protections, the *Hazelwood* exception should be construed narrowly.[24] It applies only where the speech is

---

[24] Indeed, the Supreme Court in recent years has made it clear that the First Amendment has a broad reach, limited only by narrow, traditional carve-outs from its protection. This year, the Court held that California's statute prohibiting the sale of violent video games to minors was a content-based restriction that violated the minors' First Amendment rights. *See Brown v. Entm't Merchs. Ass'n*,131 S. Ct. 2729, 2736, 2741-42 (the State possesses no "free-floating power to restrict the ideas to which children may be exposed"). The Court concluded that laws imposing unjustified restrictions on children's speech and religious freedom are manifestly unconstitutional. *See id.* at 2736 n.3 ("In the absence of any precedent for state control, uninvited by the parents, over a child's speech and religion (Justice Thomas cites none), and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional."). The Court also held

No. 09-40373

school-sponsored, a determination that turns on whether "the views of the individual speaker [might be] erroneously attributed to the school." *Id.* at 271. Thus, *Hazelwood* "allows a school to regulate what is in essence the school's own speech, that is, articles that appear in a publication that is an official school organ." *Morse,* 551 U.S. at 423 (Alito, J., concurring). Similarly, the Court's Establishment Clause jurisprudence draws a sharp distinction "between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *See Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990). "The proposition that schools do not endorse everything that they fail to censor is not complicated." *Id.*

In short, whatever latitude school officials may have with respect to school-sponsored speech under *Hazelwood*, or with government-endorsed speech under the Establishment Clause—that is, speech that could be erroneously attributed to the school—outside of that narrow context, viewpoint discrimination against private, student-to-student, non-disruptive speech is forbidden by the First Amendment.

**D.**

We now consider the allegations in the complaint under this framework. Under *Hazelwood* and *Morse*, the four incidents at issue in this case, based on

---

that the First Amendment shields hateful protestors from tort liability for picketing funerals of service members, confirming our commitment "to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 131 S. Ct. 1207, 1220 (2011). Last year, the Court protected portrayals of animal cruelty, *United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010), firmly rejecting the government's invitation to analyze free speech on cost-benefit terms, *see id.* at 1585-86, and held that the government may not suppress political speech on the basis of the speaker's corporate identity. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 913 (2010).

the facts alleged in the complaint, do not involve "school-sponsored" speech. Accordingly, the principals were not permitted to discriminate on the basis of viewpoint; yet, in each incident the principals allegedly censored speech solely because it expressed a religious message.[25]

The first incident—Stephanie's sharing pencils with her friends after school on the sidewalk—is a far cry from the concerns the *Hazelwood* Court had about the "First Amendment [requiring] a school affirmatively to promote particular student speech." Principal Bomchill's decision to grab Stephanie and confiscate the pencils after school and threaten her with expulsion is exactly the kind of action prohibited by *Tinker*—a school official's "silenc[ing] a student's personal expression that happens to occur on school premises." Stephanie's sharing of pencils with friends after school could in no way be construed as

---

[25] Since the district court's opinion denying qualified immunity, the district court had upheld the relevant written policy at issue here—the Plano ISD 2004 policy—against a facial constitutional challenge. The principals now contend that, because the complaint alleges that the principals acted in conformity with the written policy, their actions must have been constitutional. However, this disregards the fact that the complaint also alleges that the principals acted pursuant to unwritten customs, and practices. Indeed, the complaint alleges that the unwritten policy, custom, and practice was to apply the written policy only to religious matters, thereby applying a facially neutral policy in a discriminatory fashion. No court has addressed whether the school officials' unwritten customs and practices unlawfully discriminated against religious viewpoints, much less whether the principals applied the policy illegally. As the district court found when it adopted the magistrate judge's recommendation, "Plaintiffs' motion does not seek summary judgment on the application of the 2004 Policy to Plaintiffs. Similarly, Plano ISD's cross-motion only addresses the facial constitutionality of the 2004 Policy. Thus, the only matter the Court will consider is whether the 2004 policy was facially constitutional." As for any such contention that the principals were relying on school attorneys, there is nothing in the complaint to support such a contention, and at this 12(b)(6) stage, we cannot consider facts outside the complaint.

In addition, this court has upheld as facially valid the time, place, and manner restrictions in a revised 2005 policy, which does not apply to the allegations in this case. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009), *cert. denied*, 131 S. Ct. 3503(2010). It is well-settled that reasonable time, place, and manner restrictions, which are content and viewpoint neutral, are permitted under the First Amendment. *See Canady*, 240 F.3d at 442-43.

speech that could be erroneously attributed to the school and therefore, under *Hazelwood*, is not school-sponsored speech. Moreover, Bomchill told Stephanie and her mother that her "Jesus" pencils were not permitted because they expressed a religious viewpoint.

Of the remaining three incidents, two of them also involved Stephanie—one involving sharing pencils at lunch, and one involving talking to her friends about a local church play and handing out tickets at school, but at non-curricular times. The facts alleged do not indicate that Stephanie's personal expression could be erroneously attributed to the school by Stephanie's friends. In addition, the only reason provided by school officials for restricting the speech at issue is that students may not express a religious viewpoint on school property. For example, Bomchill allowed Stephanie to share a "moon" pencil at lunch break but not a "Jesus" pencil. Moreover, in the past, at half-birthday parties, school officials have permitted pencils with snowmen and snowflakes, commercial speech, such as a Lion King ring with words and pencils with the statement "Where's Hippo?," but here they discriminated against Stephanie's "Jesus" pencil.

As for the incident involving a "winter break" party, school officials prevented Jonathan Morgan from giving some of his friends candy-cane shaped pens with a card explaining the Christian origin of candy canes. Jonathan's sharing of candy-cane shaped pens could not be erroneously attributed to the school by his friends and classmates. These were his gifts. They were individually marked with his name and the recipient's name. In addition, Jonathan Morgan would have been allowed to share his candy-cane pen in his goodie bag only if he removed the attached card containing a religious message. The only reason Swanson gave Jonathan for restricting his speech is that students may not express a religious viewpoint on school property.

None of the speech at issue could be fairly characterized as "in essence the school's own speech" or "government speech endorsing religion." Therefore, none of *Hazelwood*'s concerns are implicated here, and at this stage of the proceedings, the district court and the panel opinion correctly held that the school-sponsored exception does not apply.

For the same reasons, the students' speech could not have presented Establishment Clause concerns.[26] If "no one would reasonably believe that [the speech at issue] bore the school's imprimatur," *Morse*, 551 U.S. at 405, one would be hard pressed to claim that the speech could be perceived as the government's endorsing religion. *See Mergens*, 496 U.S. at 250. Indeed, a child's private conversation and decision to share a pencil, a ticket, or a candy-cane shaped pen with another child are in no way similar to students' reading prayers "over the public address system at home football games." *See Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 810 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000).

In *Santa Fe*, this court held that prayers over the public address system at football games implicated the Establishment Clause, where the school district held an election to determine which student would deliver the prayer, "maintained complete control over the programs and facilities during the reading of the prayers, including the ability to mute the microphone or remove the speaker," and screened the text of the speech for "content prior to the ceremony." *Id.* None of the speech at issue here was completely controlled by the school, or delivered in such a way as to "bear the imprimatur of the school" such that one would reasonably perceive the student speech as the government's conveying a

---

[26] The principals contend that elementary school students are more impressionable and therefore this case involves heightened Establishment Clause concerns. This is without merit. The Supreme Court has held that the Establishment Clause is not "a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." *Good News Club*, 533 U.S. at 119.

No. 09-40373

"message that religion or religious belief is favored or preferred." *See Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 593 (1989) (quoting *Wallace v. Jafree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring). Moreover, this is not a case where a government employee is selecting the religious message, *see Engel v. Vitale*, 370 U.S. 421, 422-23 (1962), delivering the religious message, *see Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 207-08 (1963), endorsing the religious message, *Wallace v. Jaffree*, 472 U.S. 38, 56-59 (1985), or giving an otherwise private speaker preferential access to a forum, *see Stone v. Graham*, 449 U.S. 39, 42 (1980) (per curiam). In short, this is not a case about the government's endorsing religion. Accordingly, there is no Establishment Clause concern at issue in this case.[27]

In short, what one child says to another child is within the protection of the First Amendment unless one of the narrow exceptions discussed above applies, and none does in this case. Accordingly, we hold that the First Amendment protects all students from viewpoint discrimination against private, non-disruptive, student-to-student speech. Therefore, the principals' alleged

---

[27] The First Amendment "mandates governmental neutrality" not only among different religions, but also "between religion and non-religion." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005). Accordingly, school officials need not fear an Establishment Clause violation from allowing schoolchildren with religious views to speak under the same reasonable, viewpoint-neutral terms as other students. *See Hedges*, 9 F.3d at 1299 ("[p]ermitting individual students to pass out literature with religious messages, at times and places they could pass out literature with political or artistic themes, does not entail a . . . preference" and instead reflects "neutrality toward religion."). In contrast, a school's efforts to expunge all religious discourse from students' private interactions represents a school-sponsored message of hostility toward all religions. *See McCollum v. Bd. of Educ.*, 333 U.S. 203, 211-12 (1948) ("hostility to religion [and] religious teachings" is "at war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion"); *cf.* Michael W. McConnell, *Religion and Its Relation to Limited Government*, 33 Harv. J. L. & Pub. Pol'y 943, 952 (2008) ("For the Framers, disestablishment and free exercise were no more intended to depress religion or to secularize society than free enterprise was intended to depress the economy.").

No. 09-40373

conduct—discriminating against student speech solely on the basis of religious viewpoint—is unconstitutional under the First Amendment.[28]

## IV.

Because we have concluded that the principals' alleged conduct violated the students' First Amendment rights, we must proceed to the second prong of qualified immunity, which asks whether those rights were clearly established at the time of the incidents. *See al-Kidd*,131 S. Ct. at 2080.

## A.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'" that every "reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A case directly on point is not required. *See id.*; *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2643 (2009) ("To be established clearly, however, there is no need that the 'very action in question [have] previously been held unlawful.'") (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999))). Rather, "[t]he central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior

---

[28] To the extent that the principals characterize the speech as "proselytizing," such a characterization does not affect our holding that religious viewpoint discrimination is not permissible against private student speech, absent substantial and material disruption. There is no such thing as "good religious speech" and "bad religious speech." As Justice Scalia observed in *Good News Club*, regardless of whether the speech is "aimed principally at proselytizing or inculcating belief in a particular religious faith," *Rosenberger*'s ban on viewpoint discrimination applies with equal force. *See Good News Club,* 533 U.S. at 126 (Scalia, J., concurring) (quoting *Good News Club*, 533 U.S. at 130 (Stevens, J., dissenting) (observing that *Rosenberger* also involved proselytizing speech). Indeed, for some evangelical Christians, proselytizing speech may be a necessary and important part of their religious beliefs, and a complete ban of proselytizing speech may implicate their Free Exercise rights as well.

84

decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). In determining whether the principals had "fair warning," we first look to the Supreme Court and our circuit's precedent. *See Pearson*, 555 U.S. at 244. We need only consider other circuits "in the absence of directly controlling authority." *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc); *cf. Pearson*, 555 U.S. at 244 (deeming it proper to consult out-of-circuit precedent where the Supreme Court and the officials' "own Federal Circuit had not yet ruled on the issue").

As discussed in Part III, it is well-settled law that elementary school students have First Amendment rights, private religious speech is fully protected, and viewpoint discrimination is prohibited in any forum. The Supreme Court's decision in *Tinker* clearly established that viewpoint discrimination against non-disruptive student speech on school property violates the First Amendment rights of students. *See Tinker*, 393 U.S. at 513; *see also Barnette*, 319 U.S. at 642. Our own circuit has already told the same Plano ISD that "viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (*Chiu I*); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (*Chiu II*). In short, the idea that students have the right to be free from viewpoint discrimination at school is not subject to reasonable debate, and has not been for more than four decades. A "'reasonably competent public official should know the law governing his conduct.'" *Kinney*, 367 F.3d at 349 (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)). Thus, the principals had fair, unmistakable warning that private, non-disruptive student speech is protected from viewpoint discrimination, and that any attempts to censor student speech should be undertaken only on the firmest of grounds.

No. 09-40373

Even if the Supreme Court's unbroken line of decisions were somehow not enough to give school districts fair warning that the First Amendment prohibits viewpoint discrimination against non-disruptive, private student speech, moreover, the Department of Education (DOE) has made clear to schools that viewpoint discrimination against religious speech in schools is prohibited. *Cf. Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002) (noting that Alabama Department of Corrections regulations and a DOJ report were capable of providing fair warning). As DOE guidelines explained as early as 1995, settled law protected students' "right to distribute religious literature to their schoolmates, subject to those reasonable time, place, and manner or other constitutionally acceptable restrictions imposed on the distribution of all non-school literature."[29] Indeed, Plano ISD's own written policy in effect at the time only permits restrictions where the speech causes material and substantial disruption, echoing the holding in *Tinker*. Further, the policy does not mention religion or anything concerning religious viewpoints.

In sum, the Supreme Court, the Fifth Circuit, and the United States government all provided fair warning to the principals that elementary school students have a right to be free from viewpoint discrimination. That school

---

[29] Since 1995, the constitutional prohibition on viewpoint discrimination against religious speech in schools has been well publicized by DOE, which has issued substantively identical guidelines during the Bush and Clinton Administrations. The Bush Administration in 2003 issued *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools*, 68 Fed. Reg. 9645 (Feb. 28, 2003). As discussed above, the Clinton Administration issued similar guidelines in 1995, 1998, and 1999, and sent the guidelines to every school district in the country. Both of these guidelines contain multiple explanations and admonitions that private student religious speech at school is protected and may not be singled out for discriminatory prohibition, in either curricular or non-curricular situations. For example, the Clinton DOE guidelines state that school officials "may not structure or administer such rules to discriminate against religious activity or speech," "schools . . . may not single out religious literature for special regulation," and "religious messages may not be singled out for suppression." *See* http://www2.ed.gov/Speeches/08-1995/religion.html (last visited July 11, 2011).

86

No. 09-40373

officials nonetheless discriminated based on viewpoint under the facts alleged is not a failure of our precedent or that of the Supreme Court, but rather of the officials themselves.[30]

As a last ditch effort, in the face of clearly established law, the principals fall back on the argument that religious speech in the schools is a very confusing area and that courts' interpretations of *Hazelwood* have varied widely. That is, relying on cases outside our circuit (which they characterize as broadening the scope of *Hazelwood*), the principals thought that the speech at issue in the four incidents was arguably school-sponsored.   The principals argue that, because the question of whether the First Amendment prohibits viewpoint discrimination in the context of school-sponsored speech remains open, their alleged conduct did not violate clearly established law.

The principals contend that because some of these cases involved "Jesus" pencils, candy-canes, holiday parties, and religious speech, they were confused. For example, *Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008) involved candy-cane shaped ornaments, *Walz v. Egg Harbor Board of Education,* 342 F.3d 271 (3d Cir. 2003) involved candy canes, "Jesus" pencils, and holiday parties, *Bannon v. School District of Palm Beach County*, 387 F.3d 1208, 1214 (11th Cir. 2004), *Fleming v. Jefferson Cnty. Sch. Dist.*, 298 F.3d 918, 930-31 (10th Cir. 2002), and

---

[30] "[G]eneral statements of the law are . . . []capable of giving fair and clear warning, and . . . a general constitutional rule . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640).  As such, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* Reducing the "clearly established" inquiry to asking whether "'the very action in question has previously been held unlawful'" places an impermissibly "rigid gloss on the qualified immunity standard," an approach "not consistent with [Supreme Court precedent]." *Id.* at 739 (quoting *Anderson*, 483 U.S. at 640).

No. 09-40373

*Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 628-29 (2d Cir. 2005) all involved religious speech.

*Curry*, a summary judgment decision from the Sixth Circuit, involved Christmas tree ornaments shaped like candy canes. *See* 513 F.3d at 574.[31] In *Curry*, "[a]s part of the fifth grade curriculum, students participated in an exercise called 'Classroom City.'" *Id.* "The event was designed to provide students a variety of learning experiences including exposure to literature, marketing, government, civics, economics, and mathematics." *Id.* "The exercise culminated in a three-day event held in the school gymnasium during which students, using [fake money], sold goods they had produced specifically for the event." *Id.* Plaintiff's social studies teacher managed the exercise, graded the students, and provided them with a written assignment for "Classroom City"—they were supposed to create, market, and sell a product. *Id.* Plaintiff decided to sell Christmas tree ornaments in the shape of candy canes, which included cards that discussed the Christian significance of the candy cane. *Id.* School officials prevented plaintiff from distributing the cards with the religious message. *Id.* at 573. Given that the speech in *Curry* took place within the ambit of the curriculum, was a graded assignment, was managed by faculty, was designed to impart knowledge and skills, and could be "perceived as bearing the imprimatur of the school," the Sixth Circuit held that it was school-sponsored speech under *Hazelwood*. *See Curry*, 513 F.3d at 577.

*Walz*, a summary-judgment case out of the Third Circuit, involved pencils with a religious message at a Parent-Teacher Organization (PTO) party. In *Walz*, the school district of Egg Harbor Township held seasonal, in-class parties several times a year, which were organized by the teachers and parents. 342

---

[31] This is an example of a case the principals could not have relied upon. The Sixth Circuit decided *Curry* in 2008, a full four years after the last incident at issue in this case.

No. 09-40373

F.3d at 273. Just prior to Easter, the school held a party in a kindergarten class where the children's parents were encouraged to donate gifts to the PTO. *Id.* The gifts were not distributed by students, but through the PTO. *Id.* The PTO collected all the gifts and distributed them to the students at a school-planned, highly structured, highly supervised, and regulated holiday party. *Id.*

Moreover, the school did not permit the distribution of "items with political, commercial, or religious references" in "class during school hours," such as a pencil that stated "Home Depot" or "Support the [New Jersey Education Association]." *Id.* at 173. The school officials in *Walz* were concerned that the PTO's distribution of gifts would be perceived as the school's endorsing a particular message. Dr. Kelpsh, the superintendent of the Board of Education (BOE), stated that the intent behind the limited gift distribution policy "was to ensure that no confusion about the origin of any distributed gifts with corporate, political, or religious messages, and also that the BOE did not want anyone to mistakenly believe that the school was endorsing any particular message." *Walz*, 187 F. Supp. 2d at 235-36 (citing Kelpsh Dep., Tr. 74-77; Walz Dep., Tr. 60:5-17.). Thus, in *Walz*, students were not permitted to distribute any gifts with any particular message or viewpoint. The conduct in *Walz* was viewpoint neutral. *Walz* held that school officials did not run afoul of student constitutional rights when they imposed subject-matter—not viewpoint-based—restrictions on student speech in the context of a "clearly defined," "organized," and "pedagogically-based" classroom activity. *See Walz,* 342 F.3d at 277-80 (citing *Hazelwood*, 484 U.S. at 273); *see also Canady*, 240 F.3d at 442-43.

At the party, kindergartner Daniel Walz "skirted the structure of this organized activity by bringing gifts that promoted a specific religious message," specifically, pencils that said "Jesus [Loves] The Little Children." *Id.* at 279.

89

Daniel gave them out himself rather than going through the PTO system. Daniel's teacher confiscated the pencils and the superintendent determined that the pencils could not be distributed because the children and parents "might perceive the message as being endorsed by the school." *Id.* The Third Circuit agreed, holding that the school officials were permitted to restrict the speech at issue because this was not a situation where one student "turned to his classmates during snack time and stated, 'Jesus loves the little children,'" a situation where the student speaks as an individual. *Id.* Rather, this was a case where a student "controvert[ed] the rules of a structured classroom activity with the intention of promoting an unsolicited message." *Id.* at 280.

The Third Circuit in *Walz* based its decision on extensive summary judgment evidence, and held that the speech at issue was school-sponsored because "[t]he District Court found 'abundant evidence that the school seasonal parties for these young children were meant to have an educational component, and also that they were highly structured, supervised, and regulated.'" *Walz*, 342 F.3d at 279; *see also id.* at 280 ("The seasonal holiday parties were instructional activities, as much a part of the curriculum as 'show and tell' or art class."). As the *Walz* court observed, "several factors combined to demonstrate school control: the teacher's role in planning the holiday parties, the PTO's control over the gift distribution, and the directive of generic gifts." *Id.* at 279.

Our sister circuits' decisions in *Bannon*, *Fleming*, and *Peck* all upheld some restrictions on religious speech in the school-sponsored context, either at summary judgment or after a full trial on the merits. For example, in *Bannon*, the court held that school murals painted by students appearing in "prominent locations in the school," including next to the school's main office, and in a main hallway, were considered to be school-sponsored because they were "allowed to become a part of the school itself, which in this case, [they] did." *See Bannon*,

387 F.3d at 1214; *see also Fleming*, 298 F.3d at 930-31 (same with respect to school tiles). Likewise, in *Peck,* the court found the speech to be school-sponsored where kindergarten students created posters as an assignment for class, the school had guidelines about what the posters were supposed to be, and the posters were exhibited prominently at a school assembly, not unlike the school-regulated, edited, and featured school newspaper in *Hazelwood.*[32]

While these cases involved religious speech, just as our case does, they have no legal effect on the outcome of this case. Under *McClendon*, we need not consider any of them because the contours of the *Hazelwood* exception were clearly established by the Supreme Court sixteen years ago in *Hazelwood* itself. 305 F.3d at 329. Under *Hazelwood*'s well-established rule, none of the speech at issue here is even arguably school-sponsored. Even assuming we should consider these cases, none of them change the fact that the student speech alleged here was quintessentially private speech.[33] Unless we accept the simplistic proposition that anything involving religion is confusing, and that the words "candy cane" or "holiday party" are talismanic, these cases do not vitiate the fair warning provided by the Supreme Court, this court and the U.S. government. None of the reasoning in these cases, all applying *Hazelwood* (some

---

[32] *See* 426 F.3d at 621-22; *see also Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 92, 95-98, 100 (3rd Cir. 2009), *cert. denied*, 130 S. Ct. 1137 (2010) (upholding an elementary school's restrictions on a mother's efforts to read aloud from Bible scripture to students in her son's kindergarten classroom during a "curricular" activity); *Bell v. Little Axe Indep. Sch. Dist. No. 70*, 766 F.2d 1391, 1397, 1404-05 (10th Cir. 1985) (forbidding school from holding teacher-supervised meetings on school premises during school hours where meetings included prayer, songs, and speakers who, appearing "usually at the behest of teachers," discussed "how God and Christianity had benefitted the speaker in his or her daily life").

[33] Many of these cases were decided after the relevant actions were taken and thus, could not have been relied upon by school administrators at the time. *See Al-Kidd,*131 S. Ct. at 2083 (determining clearly established law by examining law "at the time of the challenged conduct").

No. 09-40373

more broadly than others), affects the speech at issue here.[34]  In each of the four incidents, the allegations, which must be taken as true, show that the speech was private, student-to-student speech and was impermissibly censored solely on the basis of religious viewpoint.

### B.

Principal Bomchill had fair warning that preventing Stephanie from sharing a pencil with one of her friends after school hours, outside of school on the sidewalk and lawn solely on the basis of religious viewpoint is prohibited by the First Amendment.  *See Tinker*, 393 U.S. at 513.  A reasonable official in Bomchill's position would not have been confused about the nature of the speech at issue here: neither is it school-sponsored nor does it implicate the Establishment Clause.  This was a situation where a single student was sharing a pencil with another student; the school was simply not involved.  *See Hazelwood*, 484 U.S. at 270-71 (The First Amendment protects "a student's personal expression that happens to occur on school premises").  None of the *Hazelwood* factors apply here: given that the speech took place outside of the school building after school hours, the speech was not controlled by the school, part of the school curriculum, highly supervised by faculty members, or reasonably related to legitimate pedagogical concerns.  Most importantly, unlike the school murals in *Bannon*, which had become "part of the school itself," or the school newspaper in *Hazelwood*, there was no reasonable concern that Stephanie's speech "might be erroneously attributed to the school."  *See id.* at 288.  Therefore, based on the facts alleged, I would affirm the motion to dismiss

---

[34] Our discussion of our sister circuits' interpretation of *Hazelwood* does not in any way suggest our approval of their application of the school-sponsored exception, only that even a broad application of this exception is not relevant to the facts alleged here.  Moreover, we need not comment on the correctness of these cases because, as discussed above, under *McClendon*, we have no reason to consider them.

No. 09-40373

denying qualified immunity to Bomchill as to this incident because a reasonable official would have known that restricting Stephanie's private, non-disruptive, non-curricular, student-to-student speech after school, outside of school on the sidewalk, is not permitted under the First Amendment.

## C.

Similarly, Bomchill had fair warning that preventing Stephanie from sharing tickets with friends to a drama at a local church and directing Stephanie's teacher to demand the return of tickets already given out to other students, "while at school but during non-curriculum times" is not permitted under the First Amendment. *See Tinker*, 393 U.S. at 506; *Barnette*, 319 U.S. at 637; *Burnside*, 363 F.2d at 749. Although we do not know where exactly Stephanie's actions took place, or how many tickets she shared, the complaint alleges that the action did not take place during a curricular time, and at this stage, we accept factual allegations in the complaint as true, drawing all inferences in favor of Stephanie, the non-movant. *See Brown*, 188 F.3d at 586.

As with the "Jesus" pencils, a reasonable official would not have been confused about the speech at issue in this case. No reasonable official would think that Stephanie's conversation with her friends and decision to share free tickets to a drama put on by a local church were school-sponsored speech. The school was not required to "affirmatively . . . promote" the drama; Stephanie was sharing the tickets as an individual, on her own time at school. This was not in "essence, the school's own speech": Stephanie's conversation with her friends was not controlled by the school or highly supervised by faculty members. Unlike the speech in *Curry*, which was expressly part of the school curriculum, her decision to share tickets with friends who expressed an interest in attending a local play had nothing to do with the school curriculum. The speech took place "during non-curriculum times" and was not reasonably related to legitimate pedagogical

No. 09-40373

concerns. *See Hazelwood*, 484 U.S. at 270-71. Therefore, based on the facts alleged, I would affirm the denial of qualified immunity to Bomchill as to this incident because a reasonable official would have known that restricting Stephanie's private, non-disruptive, non-curricular, student-to-student speech while at school but during non-curriculum times is not permitted by the First Amendment.

**D.**

Finally, Bomchill had fair warning that preventing Stephanie from sharing a "Jesus" pencil with her friends at her half-birthday party in the cafeteria during lunch, while allowing a "moon" pencil to be shared, was impermissible viewpoint discrimination under the First Amendment. *See Rosenberger*, 515 U.S. at 828-29) (restrictions on speech violate the First Amendment where the "specific motivating ideology or the opinion of perspective of the speaker is the rationale for the restriction"). As with the prior two incidents, Bomchill's contention that this egregious viewpoint discrimination was permissible because she was confused about whether the speech was school-sponsored speech is not plausible. According to the complaint, Stephanie's half-birthday party was not expressly part of the curriculum, her decision to share a pencil with a friend was not a graded assignment. *See Curry*, 513 F.3d at 574. We do not know whether the lunch-time party was highly-regulated, or highly-supervised, but the complaint does not allege as such, and at this stage, we must accept all factual allegations as true, drawing all inferences in favor of Stephanie, the non-movant. *See Brown,* 188 F.3d at 586. Most importantly, there was no reasonable concern that Stephanie's speech would be considered to be the school speaking. *See Hazelwood*, 484 U.S. at 273. Unlike the religious school tiles that the students painted in *Fleming*, which became a permanent fixture of the school itself, here, Stephanie, as an individual, would have directly

94

handed a pencil to a friend. Therefore, based on the facts alleged, I would affirm the denial of qualified immunity to Bomchill as to this incident because a reasonable official would have known that restricting Stephanie's private, non-disruptive, non-curricular, student-to-student speech in the cafeteria during lunch break was not permitted under the First Amendment.

## E.

We now turn to Principal Swanson. Swanson had fair warning that preventing Jonathan from sharing individually-addressed goodie bags that contained candy-cane shaped pens with a "Legend of the Candy Cane" story, constituted impermissible viewpoint discrimination. *See Tinker*, 393 U.S. at 506; *Barnette*, 319 U.S. at 637; *Burnside*, 363 F.2d at 749. No reasonable official would think that Jonathan's sharing of candy-cane shaped pens with a religious message with his friends at the party was school-sponsored speech. This was private speech from one student to another, with each goodie bag marked with Jonathan's name and with the name of the friend he was sharing the bag with. His friend would understand that the gift was from Jonathan, not from the school. This speech was not part of the school curriculum, did not take place during an actual class, and was not reasonably related to legitimate pedagogical concerns. Because the speech is private and voluntary, it does not matter that it took place in the school building. *See Santa Fe*, 530 U.S. at 313 ("[N]othing in the Constitution interpreted by the Court prohibits any public school student from voluntarily praying at any time before, during, or after the school day."). In *Hazelwood*, the school funded the newspaper, "selected [the] editors, scheduled the publication dates," "edited [the] stories, . . . dealt with the printing company," and had "final authority with respect to almost every aspect of the production and publication of the [paper], including its content." *Hazelwood*, 484 U.S. at 268. Here, Jonathan selected the gift, Jonathan chose the message,

Jonathan paid for the gift, Jonathan put together the goodie bags, Jonathan hand-addressed them to his classmates, and Jonathan had "final authority with respect to almost every aspect" of his intended gift, "including its content." *See id.* It was Jonathan's gift and Jonathan's speech. There was no reasonable concern that Jonathan's speech "might be erroneously attributed to the school" or was somehow "in essence the school's own speech."

*Walz* also involved seasonal parties and candy canes, but the similarities end there. In contrast to *Walz*, here we do not have extensive summary judgment evidence such as deposition testimony. We have only the complaint. The complaint alleges that the "winter break" party has never been a part of the PISD "curriculum," noting that no written curriculum exists for the party, that Jonathan and the other students were not graded for their participation in the party, and that PISD has never given grades for such parties. This was not the case in *Walz*, where the court concluded based on the summary judgment evidence that the party was expressly part of the curriculum. *Walz*, 342 F.3d at 279. Unlike in *Walz*, where the PTO organized the party, collected all the gifts, and distributed them to the students, here students were permitted to bring in their own gifts to distribute themselves. *Id.* at 278. In other words, the speech at issue here was like the student's speaking to his classmates at snack time—as an individual—which is protected speech. *See Walz*, 342 F.3d at 279 (observing that the court did not confront a situation where a student "turned to his classmates during snack time and stated, 'Jesus loves the little children,'" a situation where the student speaks as an individual and the speech is protected). In addition, there is no evidence at this stage that the "winter break" parties were "highly structured, highly supervised, and regulated" like the party in *Walz. Id.* Further, in *Walz*, school officials were concerned about the school's promoting a particular message and therefore did not permit the PTO to

No. 09-40373

distribute gifts containing a commercial, political or religious message at the holiday party. Here the complaint does not allege that Swanson or Plano ISD had any such concerns. *Id.* Rather, they singled out and silenced only messages that expressed a religious viewpoint. *Id.*[35] Indeed, although Swanson told Jonathan that he had to remove his gifts from the classroom and place his goodie bags in the school library or distribute his gift bags on a public sidewalk off of school property, Jonathan's other classmates were allowed to exchange gift bags inside the classroom, and were never required to place their gift bags in the library.

Any argument that the winter break party in our case must have been curricular because the party in *Walz* was curricular impermissibly disregards the allegations in the complaint, which we must accept as true, and draws inferences against the students about the nature of the party. At this stage, we cannot resolve disputed facts and we must draw all inferences in favor of the students, not against them. *See Roe*, 299 F.3d at 400; *Brown,* 188 F.3d at 586.[36]

---

[35] The fact that school administrators may restrict speech that interferes with classroom instructions (and could reasonably be viewed as bearing the school's imprimatur) does not mean that they may single out religious speech for special censure or condemnation. Certainly nothing in *Walz* purports to disregard decades of controlling Supreme Court precedent prohibiting viewpoint discrimination.

[36] The principals contend that the "winter break" party had a clearly defined curricular purpose, was highly structured, supervised and regulated. Principals base these contentions on exhibit 7 to the students' First Amendment Complaint, a letter drafted by principals' counsel to the students. The students attached this exhibit in order to show that the principals' claims in the letter were inaccurate and false. Specifically, the complaint alleges that the letter's "explanation that students are not permitted to distribute any materials is simply inaccurate in practice, and has not historically occurred at Thomas." Also, Swanson never "mentioned anything about 'curriculum' in any of [her] communications about the distribution of religious viewpoint material by students to other students." Further, "the 'winter break' party was never . . . a part of the PISD 'curriculum' as [the attached] letter posits." The complaint also alleges that "PISD has never produced a copy of the curriculum for the 'winter break' party. No written curriculum exists." To the extent that there is a conflict between the factual allegations in the complaint and the principals' arguments based on the letter, we must accept the complaint's version as true and draw all reasonable

No. 09-40373

Crucially, nothing about a student's sharing an individually addressed goodie bag with a candy-cane shaped pen with another student conveys the message of the school speaking, or is somehow in "essence the school's own speech, that is, articles that appear in a publication that is an official school organ." *Morse,* 551 U.S. at 423 (Alito, J., concurring). Of course, summary judgment evidence may ultimately demonstrate otherwise—that the party here was curricular, that the activity was "highly structured, highly supervised, and regulated," and that Jonathan's speech could be "erroneously attributed to the school." But at this motion to dismiss stage, the facts allege viewpoint discrimination against private student speech, which is a violation of clearly established law. Therefore, based on the facts alleged, I would affirm the denial of qualified immunity to Swanson as to this incident because a reasonable official would have known that restricting Jonathan's private, non-disruptive, non-curricular, student-to-student speech while at school but at non-curricular times was not permitted under the First Amendment. *See Walz*, 342 F.3d at 279.

## F.

We are not unsympathetic to school administrators who have to make numerous difficult decisions about when to place restrictions on speech in our public schools. Certainly, there could be some gray area where the administrator should get the benefit of the doubt in such situations. However, the four incidents in this case are nowhere near the gray area. If we accept the principals' argument in this case, where the speech is so far from the realm of school-sponsored speech, then it is difficult to imagine a case where the law will be sufficiently clear to overcome immunity. The result would be that in every

---

inferences in favor of the students. *See Gonzalez v. Kay*, 577 F.3d 600,603 (5th Cir. 2009) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). On a motion to dismiss, we do not have the power to resolve factual disputes. *See Roe,* 299 F.3d at 400.

No. 09-40373

case involving religious discourse, schools officials could merely throw their hands up in bewilderment, claim ignorance or confusion, and freely censor private religious speech without consequence. The principals' position in this litigation is extreme: at oral argument, when asked what rights students clearly have regarding religious speech, counsel for the principals replied that he did not know. This is not only unacceptable, it is unreasonable. A reasonable school official is presumed to know the law. It is clearly established law that viewpoint discrimination is verboten. *See Rosenberger*, 515 U.S. at 828-29. As discussed in Part III, the speech at issue in this case could neither be perceived as the school's speaking or the government's endorsing religion. Any mistake on this score was an unreasonable one—in other words, a mistake that a reasonable principal would not have made.

## V.

Imagine the United States of America where the First Amendment protects a minor's right to play violent video games,[37] a person's right to hatefully protest the funerals of our heroic men and women in the miliary,[38] and the right to possess portrayals depicting animal cruelty, such as videos of people crushing kittens with their shoes,[39] but does not protect a child's right to share a pencil with another child at school merely because the pencil says the word "Jesus."

Our nation was built on the foundation of religious liberty and free speech.[40] This principle has been enshrined in our Constitution: "Congress shall

---

[37] *See Entertainment Merchants Ass'n*, 2011 WL 2518809, at *10.

[38] *Snyder*, 131 S. Ct. at 1220.

[39] *Stevens*, 130 S. Ct. at 1592.

[40] Thomas Jefferson introduced the Virginia Statute of Religious Freedom in 1779, a statute that formed the basis of our First Amendment. It began with the words "An Act for

No. 09-40373

make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. amend. I. We must ensure that the First Amendment "means what it says" when it comes to protecting all viewpoints, including religious viewpoints . *See Tinker*, 393 U.S. at 513. "Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

---

establishing religious Freedom. Whereas, Almighty God hath created the mind free." Virginia Statute of Religious Freedom (1786).